ERVIN, Justice.
**138 In this case, we are called upon to decide whether the Court of Appeals erred by determining that the trial court did not err by refusing to grant a new trial to a defendant who was held liable pursuant to N.C.G.S. § 78A-56(a)(2), which prohibits a person from selling securities by means of false and misleading statements of material fact. After carefully considering the record in light of the applicable law, we modify and affirm the Court of Appeals' decision to uphold the trial court's judgment.
I. Factual Background
A. Substantive Facts
Defendant Gregory Brannon[1] met plaintiff Lawrence Piazza in 1986, when they were both students at the University of Chicago Medical School. After graduating from medical school, Dr. Piazza became an eye surgeon while defendant practiced obstetrics and gynecological medicine. Defendant met Robert Rice in the early 1990s. Defendant, along with Dr. Piazza, invested in Arckosian, a start-up entity that Mr. Rice had founded that later went out of business. Following the demise of Arckosian, Mr. Rice co-founded, with David Kirkbride, a company called Z Reality. In 2006, defendant met John Cummings when Mr. Cummings accompanied his wife to a prenatal appointment. Similarly, defendant met plaintiff Salvatore Lampuri during defendant's attendance upon Mr. Lampuri's wife in connection with the birth of the couple's first child.
In 2007, Mr. Rice and Mr. Kirkbride founded Neogence Enterprises, Inc., a technology company that had developed and was attempting to market an augmented reality *482 application for smartphones known as Mirascape. The funding upon which Neogence relied was provided by "angel investors," including Dr. Piazza, who received convertible promissory notes in connection with the making of their investments. Mr. Rice served as Neogence's Chief Executive Officer, with responsibility for fundraising and technical development, while Mr. Kirkbride assisted with Neogence's fundraising efforts. Defendant became a member of Neogence's board of directors, upon which he served with Mr. Rice and Mr. Kirkbride. In 2009, Mr. Cummings joined Neogence as Chief Sales Officer.
On 29 April 2010, Mr. Cummings attended a social event in New York at which he met an account executive from McGarry Bowen, an advertising agency that served a number of clients, including Verizon **139 Wireless. The McGarry Bowen account executive invited Mr. Cummings to a meeting with Verizon that had been scheduled for the following day. At the 30 April 2010 meeting, Mr. Cummings described the work that Neogence was doing to various McGarry Bowen employees and a Verizon executive. During the course of this meeting, a McGarry Bowen account executive told Mr. Cummings that McGarry Bowen would consider using Mirascape as part of an upcoming advertising campaign in the event that Neogence was able to develop Mirascape consistently with McGarry Bowen's expectations.
After the meeting ended, Mr. Cummings discussed what had happened with defendant, Mr. Rice, and Mr. Kirkbride. On the same date, defendant e-mailed Dr. Piazza for the purpose of informing him of what had occurred during the McGarry Bowen meeting and stating that Neogence needed an additional $ 100,000.00 to $ 200,000.00 as quickly as possible to take advantage of the opportunity that had arisen during the McGarry Bowen meeting. Later that day, Mr. Rice sent an e-mail to Dr. Piazza seeking an additional $ 200,000.00 in "angel funding" relating to this "opportunity." On 28 May 2010, Dr. Piazza invested an additional $ 150,000.00 in Neogence following a meeting with Mr. Cummings and Mr. Kirkbride. In addition, defendant, Mr. Rice, and other Neogence agents discussed what had happened at the McGarry Bowen meeting with Mr. Lampuri. Subsequently, Mr. Lampuri made an investment in Neogence as well.
Unfortunately, Neogence was unable to get Mirascape to function properly in a timely manner. During the following year, Neogence began to experience financial difficulties. After failing to comply with Dr. Piazza's request that his investment be returned in accordance with the provisions of his convertible promissory notes, Neogence ceased doing business in early July 2011. Dr. Piazza eventually filed suit against Neogence to enforce the convertible promissory notes and obtained the entry of a default judgment.
B. Procedural History
On 10 October 2012, plaintiffs filed a complaint against defendant, Mr. Kirkbride, and Mr. Rice in which they sought to recover damages from defendants on the basis of allegations that defendants had committed material violations of the North Carolina Securities Act. In apt time, defendants filed responsive pleadings in which they sought dismissal of plaintiffs' complaint, denied the material allegations of plaintiffs' complaint, asserted various counterclaims and crossclaims, and raised various affirmative defenses, including, but not limited to, contributory **140 negligence, failure to mitigate damages, failure to show reasonable reliance, unclean hands, and waiver and estoppel. On 25 November 2013, Judge Donald W. Stephens entered an order granting summary judgment in favor of Mr. Kirkbride and refusing to grant summary judgment in favor of defendant and Mr. Rice.
The issues between plaintiffs and the remaining defendants came on for trial before the trial court and a jury at the 10 February 2014 civil session of Superior Court, Wake County. At the conclusion of the trial, the trial court submitted the following issues to the jury for the purpose of determining whether plaintiffs were entitled to recover damages from defendant based upon a violation of N.C.G.S. § 78A-56(a)(2)[2] :
ISSUE 1:
*483 Did Defendant, Gregory Brannon, in soliciting the Plaintiff, Lawrence Piazza, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, Lawrence Piazza, was unaware of the true or omitted facts?
ANSWER: Yes
If you answer the first issue "yes," move to the second issue. If you answer the first issue "no," move to the third issue.
ISSUE 2:
Did the Defendant, Gregory Brannon, not know and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to the Plaintiff, Lawrence Piazza?
**141 ANSWER: No
No matter your verdict on the first and/or second issues, move to the third issue.
ISSUE 3:
Did the Defendant, Gregory Brannon, in soliciting the Plaintiff, Salvatore Lampuri, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, Salvatore Lampuri, was unaware of the true or omitted facts?
ANSWER: Yes
If you answer the third issue "yes," move to the fourth issue. If you answer the third issue "no," move to the fifth issue.
ISSUE 4:
Did the Defendant, Gregory Brannon, not know and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to the Plaintiff, Salvatore Lampuri?
ANSWER: No
On the other hand, in answering the same questions regarding Mr. Rice, the jury determined that Mr. Rice had not made any false or misleading statements to plaintiffs. On 13 March 2014, the trial court entered a judgment ordering defendant to pay $ 150,000.00 in compensatory damages to Dr. Piazza and $ 100,000.00 in compensatory damages to Mr. Lampuri and to pay plaintiffs $ 123,804.00 in attorney's fees and $ 8,493.79 in costs, plus interest. On 17 March 2014, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. On 11 April 2014, the trial court denied defendant's motion. On 21 April 2014 and 5 May 2014, defendant noted an appeal from the final judgment, the order awarding costs and attorneys' fees, and the order denying his motion for judgment notwithstanding the verdict or a new trial to the Court of Appeals.
In challenging the trial court's judgment and orders before the Court of Appeals, defendant argued that the trial court had erred by determining that plaintiffs had sufficiently established that defendant was liable **142 to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2), including whether defendant was primarily or secondarily liable and whether plaintiffs were required to prove that defendant acted with scienter; declining to instruct the jury concerning the extent to which defendant was entitled to rely upon the director safe harbor provision set out in N.C.G.S. § 55-8-30(b) ; denying defendant's motion for a new trial on the grounds that the verdict was impermissibly inconsistent; and ordering defendant to pay attorneys' fees to plaintiffs. Piazza v. Kirkbride , 246 N.C. App. 576, 600-01, 603, 611, 614, 785 S.E.2d 695, 710-12, 717, 719 (2016). On 5 April 2016, the Court of Appeals filed an opinion concluding that " 'any person' who is a seller or offeror" of securities is liable pursuant to N.C.G.S. § 78A-56(a). Id . at 603, 785 S.E.2d at 712. In addition, the Court of Appeals held that "a section 78A-56(a)(2) civil plaintiff need not prove scienter ," so that "a materially false or *484 misleading statement or omission made in connection with a security offer or sale is actionable even if the person making the statement or omission did not know it was false, so long as the person was negligent under section 78A-56(a)(2)," id . at 601, 785 S.E.2d at 711, and that "a defendant does not have to be a securities professional to be liable under the" North Carolina Securities Act, id . at 602, 785 S.E.2d at 712. Moreover, the Court of Appeals rejected defendant's contention that the trial court had erred by refusing to deliver a director safe harbor instruction given that "the jury found [defendant] liable to Plaintiffs ... for his individual representations, which were the product of his own acts," rather than "his directorial responsibilities set out by the board," id . at 605-06, 785 S.E.2d at 713-14, and that defendant had "waived the Safe Harbor affirmative defense" by failing to plead it, id . at 609, 785 S.E.2d at 716. Finally, the Court of Appeals observed that "it is not illogical or inconsistent for two [Securities Act] defendants to achieve different results in a single action." Id . at 611, 785 S.E.2d at 717. Although a majority of the Court of Appeals affirmed the challenged trial court decisions, Judge Tyson filed a partial dissent in which he concluded that "[t]he trial court erred by failing to instruct the jury on the Director Safe Harbor provision as [defendant] requested in light of the evidence presented," id . at 615, 785 S.E.2d at 719-20 (Tyson, J., concurring in part and dissenting in part), and that the jury's verdicts with respect to defendant's liability to Dr. Piazza were impermissibly inconsistent with the jury's verdict with respect to Mr. Rice's liability to Dr. Piazza on the grounds that it was "extreme, legally unsound, and patently illogical" "[t]o deem [defendant] Brannon's statements to [plaintiff] Piazza as 'securities fraud,' while acquitting [defendant] Rice, the Chief Executive," id . at 615, 785 S.E.2d at 720. **143 On 10 May 2016, defendant noted an appeal to this Court from the Court of Appeals' decision based upon Judge Tyson's dissent. On 18 August 2016, this Court allowed defendant's petition for discretionary review with respect to additional issues.
II. Substantive Legal Analysis
A. Inconsistent Verdicts
In seeking to persuade us to reverse the Court of Appeals' decision, defendant initially argues that the trial court erred by denying his motion for a new trial on the grounds that the jury's determinations that defendant, but not Mr. Rice, made false and misleading statements to plaintiffs "are so contradictory as to invalidate the judgment" given that the statements that defendant and Mr. Rice made to plaintiffs were essentially identical, quoting Palmer v. Jennette , 227 N.C. 377, 379, 42 S.E.2d 345, 347 (1947). In defendant's view, the Court of Appeals erred by reconciling the jury's verdicts based upon the relative strength of the showings that defendant and Mr. Rice made with respect to the reasonable care issue. Although we agree with defendant that the logic upon which the Court of Appeals relied in upholding the trial court's decision to deny defendant's new trial motion was faulty, we do not believe that the trial court abused its discretion by rejecting defendant's contention that the jury's verdicts were impermissibly inconsistent.[3]
"The trial judge has the discretionary power to set aside a verdict when, in his opinion, it would work injustice to let it stand; and, if no question of law or legal inference is involved in the motion, his action in so doing is not subject to review on appeal *485 in the absence of a clear abuse of discretion." Selph v. Selph , 267 N.C. 635, 637, 148 S.E.2d 574, 575-76 (1966) (first citing Goldston v. Wright , 257 N.C. 279, 279, 125 S.E.2d 462, 463 (1962) (per curiam); then citing Walston v. Greene , 246 N.C. 617, 617, 99 S.E.2d 805, 805-06 (1957) (per curiam); then citing **144 Roberts v. Hill , 240 N.C. 373, 380, 82 S.E.2d 373, 380 (1954) ; and then citing Pruitt v. Ray , 230 N.C. 322, 322-23, 52 S.E.2d 876, 876-77 (1949) (per curiam)). Inconsistent verdicts in the same actions may constitute grounds for awarding a new trial. See, e.g., Porter v. W. N.C. R.R. Co. , 97 N.C. 66, 73-75, 2 S.E. 580, 583-85 (1887) (ordering a new trial when the jury's answer to one question indicated that the plaintiff did not negligently contribute to the accident that led to his death while its answer to another question indicated that the same plaintiff was contributorily negligent). As defendant candidly concedes, the decision concerning whether to grant a new trial on the basis of allegedly inconsistent verdicts is one of discretion rather than one of law. For that reason, our review of defendant's challenge to the denial of his motion for a new trial on the grounds that the jury's verdicts were impermissibly inconsistent "is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge." Worthington v. Bynum , 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982) (citations omitted). An abuse of discretion has occurred when a trial court's discretionary decision was "manifestly unsupported by reason"; for that reason, such a discretionary decision will not be overturned on appeal absent "a showing that it was so arbitrary that it could not have been the result of a reasoned decision." White v. White , 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).
The prior decisions of this Court suggest that jury verdicts should not be set aside for inconsistency lightly. For example, we have stated "that a verdict should be liberally and favorably construed with a view of sustaining it, if possible." Guy v. Gould , 202 N.C. 727, 729, 164 S.E. 120, 121 (1932).[4] Our authority to overturn a trial court's discretionary decision to grant or deny a new trial motion should be exercised "with great care and exceeding reluctance ," In re Will of Buck , 350 N.C. 621, 626, 516 S.E.2d 858, 861 (1999), given our "great faith and confidence in the ability of our trial judges to make the right decision, fairly and without partiality, regarding the necessity for a new trial" in light of "their active participation in the trial, their first-hand acquaintance with the evidence presented, their observances of the parties, the witnesses, the jurors and the attorneys involved," Worthington , 305 N.C. at 487, 290 S.E.2d at 605, and our belief that "the exercise of this discretion sets aside a jury **145 verdict and, therefore, will always have some tendency to diminish the fundamental right to trial by jury in civil cases which is guaranteed by our Constitution." In re Buck , 350 N.C. at 626, 516 S.E.2d at 861. As a result, the relevant issue is not whether we would have made the same decision that the trial court made in ruling upon defendant's new trial motion; whether we would have made different credibility determinations, viewed the evidence differently, or reached a different result than the jury, or whether there was other evidence upon which the jury could have relied in resolving the liability issues submitted for its decision in this case; instead, the issue before us is whether the trial court had a rational basis for determining that a reasonable jury could have reached different decisions with respect to the issue of whether defendant and Mr. Rice made false and misleading representations to plaintiffs. A careful review of the record in light of the very deferential standard of review applicable in this case satisfies us that the trial court did not abuse its discretion by denying defendant's motion for a new trial.
1. Statements to Piazza
On 30 April 2010, defendant sent the following e-mail to Dr. Piazza and a number of other recipients:
*486 Guys John Cummings just had a meeting in NY with Verizon. We need $ 100K - $ 200K ASAP, in 3-4 weeks we go back to Verizon we have an opportunity to be their featured AR. Rob is going to send out a summary later today. I know all of you are BUSY!!! I need you to give a few minutes to look at this potential. THANK YOU for your TRUST!!
Greg
John Cummings 919 601 9090 Rob Rice 919 802 5257
Dr. Piazza "became aware of the Verizon opportunity" when he received this e-mail. A few hours later, Mr. Rice sent the following e-mail to defendant and the recipients of defendant's earlier communication, including Dr. Piazza:
Gentlemen,
John Cummings met with McGarry Bowen (NY Marketing Agency) and the director of new technologies at Verizon (I believe that was his title) this afternoon in New York. John can give you more details directly.
**146 John basically laid out our strategy of "meeting consumer demand by providing the first social media marketplace that enables people to buy, sell, and trade virtual goods for use in mobile and augmented reality. Mirascape allows consumers to create and sell their own augmented reality content and experiences for a profit." This is important because it dramatically distinguishes us from other startups in the industry that are more focused on directory AR, single-user experiences, or marketing gimmicks for the PC.
He described our short term approach with Allied Integrated Marketing to re-purpose QR codes and turn traditional media into trigger/activation points for the delivery of media, as well as the early phase of virtual goods (dynamically linked and collectible). The next step is the earthmarks, which allow users to upload all media types to specific locations, share them with each other, interact, and build influence and reputation. The next stage of this is letting users link earthmarks and 3D media together in waypoints, which allows for drag and drop creation of treasure hunts, tour guides, and all sorts of engaging promotions and experiences.
Verizon responded extremely well to this and asked how we differentiate ourselves from others like Layar. The answer, simply put, is that we are focusing on empowering the user to create content, as well as building a vibrant virtual goods marketplace, again centered on the user. Our model is based on microtransactions and data (where I believe the real value of this emerging industry is), while others are focusing more on custom channels or layers that do not support social very well or are lacking the virtual goods. Layar may have a content store going live, letting people sell access to custom layars ("show me the nearest subway"), but we are the first launching a virtual goods marketplace (tapping into one of the newest and fastest growing multi-billion dollar markets).
While we have been seeking $ 200k in additional angel funding to meet our milestones and deliverables (June for Allied and July for a public beta launch), we now have an opportunity to go back to Verizon in about three weeks to blow their minds with a demo that shows everything we **147 are doing with Allied, as well as all of the earthmark stuff (and some of the early social marketplace functionality). The opportunity here is to become the featured AR application for Verizon, OEM'd[5] on all of the DROID smartmobiles, and leverage their marketing. Even bigger, if we can pull this off with Verizon, it puts us squarely in the limelight of catching the eyes of other Fortune 100 companies for marketing, promotions, and strategic partnerships.
The challenge here, is that we have to jump to warp speed to accelerate development ... not only to meet our milestones, but to WOW Verizon. This is a one-shot opportunity. As things currently are, we are crawling along to meeting the milestones, *487 but there is no way we can deliver the perfect demo for Verizon without immediate funding. I need resources to bring on additional developers as a strike team to do this fast, hard, and well. Not only do we need to take the app and the website to the next level, but we need to make it look fantastic, as well as the actual demo/presentation.... This is a huge chance and opportunity, but we can't do it alone. We need help finding additional angel capital that can make a decision and move quickly.
We need $ 200k. That's four people at $ 50k. I know we can do this. We are perfectly positioned to take down some phenomenal strategic partnerships and deals (on top of what we already have done), launch on the market, blow every other AR company completely out of the water, and take the lead in this industry. Even beyond that, opportunities like this emerging industry only happen once a decade or so ... unless something major happens in biotech or nanotechnology, I don't see any other world-changing technologies coming of age any time soon. Mobile, Social, Local, Virtual is the magical convergence that we are deep in the middle of with augmented reality and Mirascape.
I've attached an updated version of our pitch deck that has some new info in it for those of you that haven't seen one recently.
**148 As usual, please feel free to call or email me at any time with any questions. Thank you for everything you have done for us so far.
Best regards,
Robert Rice
CEO Neogence Enterprises
As an initial matter, we believe that the Court of Appeals' emphasis upon the extent to which defendant and Mr. Rice took reasonable care to avoid making materially false or misleading statements to Dr. Piazza, which was the subject of the second issue that the trial court submitted for the jury's consideration with respect to each defendant, as a justification for the trial court's failure to treat the jury's verdicts as impermissibly inconsistent overlooks the fact that the jury found against defendant and in favor of Mr. Rice on the basis of the "materially false and misleading statement" issue rather than on the basis of the "reasonable care" issue. The fact that the record would support differing treatment of defendant and Mr. Rice with respect to the "reasonable care" issue simply sheds no light on the extent to which a reasonable jury could have found that defendant, but not Mr. Rice, made materially false and misleading statements to plaintiffs. Thus, the Court of Appeals erred by upholding the trial court's decision to deny defendant's new trial motion on the grounds that defendant and Mr. Rice took differing levels of care to determine the accuracy of the statements that they made to Dr. Piazza. Instead, any determination of the extent, if any, to which the jury's verdicts with respect to the "materially false and misleading" statement issue were impermissibly inconsistent necessarily requires a careful examination of the statements that defendant and Mr. Rice made to Dr. Piazza and the circumstances under which those statements were made.
As defendant emphasizes, the e-mails that defendant and Mr. Rice sent to Dr. Piazza both indicate that Mirascape had an opportunity to become Verizon's featured, pre-loaded augmented reality application. On the other hand, the e-mail transmitted by Mr. Rice provided considerably more detail about the opportunity that had allegedly arisen from the McGarry Bowen meeting than the e-mail sent by defendant. Mr. Rice opened his e-mail by noting that Mr. Cummings had met with employees of McGarry Bowen and Verizon and that Mr. Cummings "can give you more details directly." Moreover, Mr. Rice provided specific details concerning the information that Mr. Cummings had presented at the meeting and noted that Neogence's work with Allied Integrated Marketing and the development of earthmarks had generated the most interest **149 from the attendees. Although Mr. Rice did, as defendant notes, state that Mirascape could "become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles," he also mentioned the actual opportunity that stemmed from the McGarry Bowen meeting, which was to "leverage [Verizon's] marketing." In addition, Mr. Rice stated that Neogence *488 would first have to create a "demo" displaying "everything we are doing with Allied, as well as all of the earthmark stuff" before mentioning other milestones that Neogence had been working to achieve, including a public beta launch scheduled for July 2010, and noting that additional funding would be needed to complete both the Verizon presentation and achieve the other pre-existing goals. A trial judge could have reasonably determined that the jury, after studying these e-mails, had a rational basis for concluding that defendant's communication, which mentions only Verizon and the opportunity "to be their featured AR," was a materially false or misleading statement and that the substantial additional information contained in Mr. Rice's communication, coupled with his open invitation for the recipients to contact him if they had any questions, provided a sufficient basis to refrain from the making of such a determination concerning Mr. Rice's communication.
Our decision to uphold the Court of Appeals' decision with respect to the inconsistent verdict issue relating to Dr. Piazza is bolstered by information contained in Mr. Rice's trial testimony.[6] Among other things, Mr. Rice testified that:
Q. Okay. Just below this specific language, you then go on to say, "The opportunity here is to become the featured AR application for Verizon-for Verizon OEMed on all the Droid smart mobiles and leverage their marketing." Are these three separate possibilities that you're discussing in regard to Verizon?
A. I believe so. I mean, this was kind of bundled together, but they were all possibilities. They all have different advantages and disadvantages.
Q. Well, how are they different?
A. Well, leveraging somebody's marketing, for example, if I have ten dollars to go out and put up some posters that I printed on my laptop somewhere, that's only going [to] get me so far. But if I have somebody, say, in a large company and say, hey, we're going to do this big campaign for a new **150 car coming out for a new movie, and sure, we'll stick your logo on the side and include you, you're basically leveraging all of those dollars to get the exposure and kind of the brand recognition, as opposed to what you would do on your own. That's very different from something where you're, you know, being OEMed or pre-installed on a mobile device. In that case, you're not getting the marketing exposure and attention, but you're getting distribution. So you-you're in front of a lot more people, and it's already in the hand. If I see an ad on TV, I think oh, that's cool maybe I'll buy the burger or download the app. But if it's already in my phone or in hand, I have it immediately. People are much more likely to play and use it. The disadvantage of OEMing is what people call bloatware.
Q. I'm sorry, what?
A. Bloatware. I don't know how many times I bought a computer or phone that had stuff on it I didn't want. You know, TurboTax or Norton Antivirus, whatever tools. So you have the advantage of more distribution, but there's also the risk that there may be some negative, you know, connotations that there's more crap on my phone and get rid of it. So there's different advantages and disadvantages depending on how it's structured.
A trial judge could have rationally determined that the jury had a reasonable basis for concluding that Mr. Rice's statement that Neogence might be able to "leverage their marketing" if Neogence was able to successfully demonstrate Mirascape at a subsequent meeting and his explanation of the benefits of "leveraging" McGarry Bowen's marketing efforts on behalf of Verizon, as compared to preloading Mirascape on Verizon phones, "significantly altered the total mix of available information" to a reasonable investor and justified a finding that Mr. Rice's statements, taken in context and as a whole, were not materially false and misleading, while the same could not be said for defendant's statements. See TSC Indus., Inc. v. Northway, Inc. , 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976) (footnote omitted) (explaining that an omission is material in the event that there is "a substantial likelihood *489 that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); Ehrenhaus v. Baker , 216 N.C. App. 59, 88, 717 S.E.2d 9, 28-29 (2011) (adopting the standard for materiality set forth in TSC Indus. ), appeal dismissed and disc. rev. denied , **151 366 N.C. 420, 735 S.E.2d 332 (2012). In other words, given that including Mirascape in McGarry Bowen's marketing efforts was the opportunity that was actually discussed at the McGarry Bowen meeting, Mr. Rice's reference to "leverag[ing] their marketing" in Mr. Rice's e-mail and his trial testimony concerning the potential value of that opportunity could have reasonably persuaded the jury that Mr. Rice's statement, as a whole, was not materially false or misleading, see Latta v. Rainey , 202 N.C. App. 587, 599, 689 S.E.2d 898, 909 (2010) (stating that "[a] misrepresentation or omission is 'material' if, had it been known to the party, it would have influenced the party's judgment or decision to act" (quoting Godfrey v. Res-Care, Inc., 165 N.C. App. 68, 75-76, 598 S.E.2d 396, 402, disc. rev. denied, 359 N.C. 67, 604 S.E.2d 310 (2004) )), while defendant's failure to make a similar statement during his own communications with Dr. Piazza might have caused a reasonable jury to reach a contrary result.
Finally, Dr. Piazza testified that he spoke to defendant on the telephone approximately seventy times between 30 April 2010 and 2 June 2010. According to Dr. Piazza, these phone calls were "more often than not" placed by defendant and included discussions of
the Verizon opportunity with me primarily ... describ[ing] it consistently with his e-mail, that because of a meeting that John Cummings had in New York and McGarry Bowen, and an opportunity to have met with a Verizon executive for new technologies, that John had an opportunity to explain what was going on at Neogence and what we were doing with Mirascape, and was intrigued enough to invite John back to Verizon to present a demo, a demo App, an application. And if that were acceptable to Verizon, we had an opportunity to be OEMed or featured AR or pre-installed on every Verizon-Verizon Droid phone.
Although Mr. Rice communicated with Dr. Piazza by e-mail on several occasions concerning the opportunities that had been discussed at the McGarry Bowen meeting, the e-mails evidencing these communications were primarily focused upon the steps that Neogence needed to take to prepare for the upcoming meeting with Verizon and to accomplish goals that the company had been working toward before the McGarry Bowen meeting.[7] We hold that the trial court had a rational basis for concluding **152 that the jury could have reasonably determined that defendant, but not Mr. Rice, made materially false and misleading statements to Dr. Piazza based, at least in part, upon the frequency with which defendant and Mr. Rice told Dr. Piazza that there was a reasonable opportunity for Mirascape to be preloaded onto Verizon phones.
As a result, after carefully reviewing the record, we conclude that the jury heard evidence from which it could reasonably conclude that defendant made more direct, less nuanced, comments to Dr. Piazza concerning the extent to which Neogence had the opportunity to have Mirascape preloaded onto Verizon phones than Mr. Rice did; that defendant reiterated this contention to Dr. Piazza more frequently than Mr. Rice did; and that Mr. Rice's statements included more accurate descriptions of the opportunity that had become available to Neogence than those made by defendant. In light of this set of circumstances, we are unable to conclude that the trial court's decision to deny defendant's request for a new trial on the basis of allegedly inconsistent verdicts arising from the statements made to Dr. Piazza by defendant and Mr. Rice, respectively, was "so arbitrary that it could not have been the result of a reasoned decision," White , 312 N.C. at 777, 324 S.E.2d at 833, or that the Court of Appeals erred by declining to set *490 aside the trial court's decision to that effect. As a result, we hold that defendant's challenge to the Court of Appeals' decision to uphold the denial of his motion for a new trial on the grounds that the jury's verdicts concerning the relative liability of defendant and Mr. Rice to Dr. Piazza were impermissibly inconsistent lacks merit.
2. Statements to Lampuri
Mr. Lampuri did not receive the e-mails that defendant and Mr. Rice sent out on 30 April 2010. Instead, Mr. Lampuri first learned of the opportunity that had been discussed at the McGarry Bowen meeting on 25 May 2010, when Mr. Lampuri and his wife went to defendant's office for an obstetrical appointment. As he examined Ms. Lampuri, defendant
proceeded to have a conversation with [Mr. Lampuri] about this exciting new opportunity that Neogence, his company had.... we've got something really exciting going on, our director of sales just got back from New York City at a meeting. There were Verizon executives there, and they were absolutely blown away by our technology that we needed-Neogence-excuse me, Neogence needed to go back, create this demo, come back and show Verizon, you know, what they've been talking about, what they've been **153 showing about this technology and they're going [to] get OEMed. They're going pre-installed on all Verizon phones.
Similarly, Ms. Lampuri testified that defendant had stated during the medical appointment "that his company had an opportunity to be featured on Verizon phones directly installed on the phone."
Mr. Rice made statements to Mr. Lampuri concerning the opportunity that had arisen at the McGarry Bowen meeting during a conference at the Neogence headquarters in mid-July 2010 that was attended by Mr. Lampuri, Mr. Rice, Mr. Cummings, and Mr. Kirkbride. At that meeting, Mr. Cummings stated
that he was in New York in a meeting with an advertising company, and that there were Verizon executives in the room. And they were, again, absolutely wowed by the technology, that we need-they needed to go back, create a demo, go back to Verizon in a couple weeks and if they-if they wowed Verizon, I like to say, then they have the opportunity to be preloaded, OEMed on all phones.
During the meeting, Mr. Rice said that "the deal was very much real," that "[i]t was a real opportunity," and that "the funds that they were seeking were to get this demo up and doing-up and coming to show Verizon." At another meeting held at the Neogence headquarters in early August, which Mr. Lampuri attended along with other members of his family, Mr. Cummings said "the exact same thing" that he had said at the prior meeting and Mr. Rice reiterated "that the deal was very much real."
Defendant contends that, given defendant's limited "interactions with [Mr.] Lampuri" and the fact that this interaction "did not occur near in time to [Mr.] Lampuri's actual investment in Neogence" and given that the two meetings in which Mr. Rice was involved occurred closer in time to the making of Mr. Lampuri's investment and that "the opportunity was described [to Mr. Lampuri] in similar terms as those presented by" defendant, the jury's verdicts that defendant, but not Mr. Rice, had made materially false and misleading statements to Mr. Lampuri were impermissibly inconsistent. A careful review of the record reflects, however, that defendant and Mr. Rice made substantially different statements to Mr. Lampuri concerning the nature of the opportunity that had become available to Neogence during the McGarry Bowen meeting. Simply put, defendant told Mr. Lampuri that Neogence had the opportunity to be preloaded onto Verizon's phones while Mr. Rice never made any such statement. Although the jury could have determined that Mr. Rice's statements during the meetings at which Mr. Lampuri was in attendance **154 that "the deal was very much real" constituted a reference to the same opportunity that was described by Mr. Cummings during those meetings and by defendant during Ms. Lampuri's medical appointment, a reasonable jury could have also interpreted *491 this statement in a different manner.[8] As a result of the fact that the record discloses ample justification for a jury decision to treat defendant and Mr. Rice differently with respect to the issue of whether either of them had made materially false and misleading statements to Dr. Piazza and Mr. Lampuri, we hold that the Court of Appeals correctly determined that the trial court did not abuse its discretion by denying defendant's request for a new trial based upon the existence of allegedly impermissible inconsistencies in the jury's verdicts with respect to the "materially false and misleading" statement issue.
B. Safe Harbor Instruction
In his second challenge to the correctness of the Court of Appeals' decision, defendant contends that the trial court erred by failing to instruct the jury in accordance with N.C.G.S. § 55-8-30(b)(1),[9] which provides that a corporate director cannot be held liable "for any action taken as a director, or any failure to take any action," N.C.G.S. § 55-8-30(d), if he or she "rel[ies] on information, opinions, reports, or statements ... prepared or presented by ... [o]ne or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented." N.C.G.S. § 55-8-30(b)(1) (Supp. 2018). According to defendant, the Court of Appeals should have construed the reasonable care standard enunciated in N.C.G.S. § 55-8-30(a)(2) in pari materia with N.C.G.S. § 78A-56(a)(2) or applied the rule of lenity to determine that the "safe harbor" defense delineated in N.C.G.S. § 55-8-30(b) precludes a finding of liability based upon the making of allegedly false and misleading statements pursuant to N.C.G.S. § 78A-56(a)(2), citing, inter alia , Meza v. Division of Social Services , 364 N.C. 61, 66, 692 S.E.2d 96, 100 (2010) (reading the language of N.C.G.S. § 108A-79(k) in pari materia with Article 4 of the Administrative **155 Procedure Act); Dellastatious v. Williams , 242 F.3d 191, 195 (4th Cir. 2001) (relying upon provisions of Virginia's corporate governance statutes in determining whether the defendants used reasonable care to prevent a state law securities violation); and Vogel v. Reed Supply Co. , 277 N.C. 119, 131, 177 S.E.2d 273, 281 (1970) (applying the rule of lenity in a civil case when construing a statute that potentially imposed civil and criminal liability). In view of the fact that defendant was a Neogence director who claimed to have merely repeated information that he had received from Mr. Cummings and that he reasonably believed Mr. Cummings to be reliable and competent, defendant argues that the Court of Appeals erred by holding that he was not entitled to have the jury instructed concerning the "safe harbor" provisions of N.C.G.S. § 55-8-30. Plaintiffs, on the other hand, argue that defendant agreed to the trial court's instruction concerning the circumstances under which he could be held liable pursuant N.C.G.S. § 78A-56(a)(2) and never properly requested delivery of the "director safe harbor" instruction to which he now claims to have been entitled.
"This Court has long held that '[w]hen charging the jury in a civil case it is the duty of the trial court to explain the law and to apply it to the evidence on the substantial issues of the action.' " Yancey v. Lea , 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001) (alteration in original) (first quoting Cockrell v. Cromartie Transp. Co. , 295 N.C. 444, 449, 245 S.E.2d 497, 500 (1978) ; then citing Superior Foods, Inc. v. Harris-Teeter Super Mkts., Inc. , 288 N.C. 213, 218, 217 S.E.2d 566, 571 (1975) ; and then citing Inv. Props. of Asheville, Inc. v. Norburn , 281 N.C. 191, 197, 188 S.E.2d 342, 346 (1972) ).[10] As a result, "[i]f *492 a party contends that certain acts or omissions constitute a claim for relief or a defense against another, the trial court must submit the issue with appropriate instructions if there is evidence which, when viewed in the light most favorable to the proponent, will support a reasonable inference of each essential element of the claim or defense asserted." Cockrell , 295 N.C. at 449, 245 S.E.2d at 500 (first citing Vernon v. Crist , 291 N.C. 646, 231 S.E.2d 591 (1977) ; and then citing Atkins v. Moye , 277 N.C. 179, 176 S.E.2d 789 (1970) ).
On the other hand, "[r]equests for special instructions must be in writing, entitled in the cause, and signed by the counsel or party submitting them." N.C.G.S. § 1A-1, Rule 51(b) (2017); see also **156 Hanks v. Nationwide Mut. Fire Ins. Co. , 47 N.C. App. 393, 404, 267 S.E.2d 409, 415 (1980) (citing King v. Powell , 252 N.C. 506, 512, 114 S.E.2d 265, 269-70 (1960), and stating that "[i]t is the duty of the party desiring instructions on a subordinate feature of the case or greater elaboration on a particular point to aptly tender request for special instructions"). In the event that a party fails to "comply with the requirements of [ N.C.G.S. § 1A-1,] Rule 51(b), the trial court act[s] properly within its discretion in denying the request." Byrd's Lawn & Landscaping, Inc. v. Smith , 142 N.C. App. 371, 379, 542 S.E.2d 689, 694 (2001) (citing Hord v. Atkinson , 68 N.C. App. 346, 351, 315 S.E.2d 339, 342 (1984) (holding that the trial court could properly refuse to instruct the jury concerning its right to consider the physical evidence in a motor vehicle negligence case on the grounds that "the plaintiff's request went beyond the trial judge's general duty of explaining the law arising on the evidence with respect to the substantial features of the case" and that, with respect to this "subordinate feature," "the plaintiff did not comply with the requirements of Rule 51(b)")); see also Koutsis v. Waddel , 10 N.C. App. 731, 733-34, 179 S.E.2d 797, 799 (1971) (stating that, "[w]here the court adequately charges the law on every material aspect of the case arising on the evidence," "the charge is sufficient and will not be held error for failure of the court to give instructions on subordinate features of the case, since it is the duty of a party desiring instructions on a subordinate feature, or greater elaboration, to aptly tender a request therefor" (quoting 7 Strong's North Carolina Index 2d: Trial § 33, at 329 (1968) (footnotes omitted))). Assuming that a proper "request is made for a specific instruction, correct in itself and supported by evidence, the trial court, while not obliged to adopt the precise language of the prayer, is nevertheless required to give the instruction, in substance at least," with "the failure [to do so] constitut[ing] reversible error." Minor v. Minor , 366 N.C. 526, 531, 742 S.E.2d 790, 793 (2013) (first quoting Calhoun v. State Highway & Pub. Works Comm'n , 208 N.C. 424, 426, 181 S.E.2d 271, 272 (1935) ; then citing State v. Davis , 291 N.C. 1, 13-14, 229 S.E.2d 285, 293-94 (1976) ; and then citing Bass v. Hocutt , 221 N.C. 218, 219-20, 19 S.E.2d 871, 872 (1942) ).
The only written request for instructions that defendant submitted for the trial court's consideration that was at all relevant to the "safe harbor" issue consisted of a verbatim recitation of N.C.P.I. Civil 807.50, a pattern jury instruction intended for use in cases in which a director is sought to be held liable for breach of his or her duty to the corporation and which provides that:
The (state number ) issue reads:
"Was the plaintiff damaged by the failure of the defendant to discharge his duties as a corporate director?"
**157 On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence, four things:
First, that the defendant failed to act in good faith. Good faith requires a director to discharge his duties honestly, conscientiously, fairly and with undivided loyalty to the corporation. Errors in judgment alone do not constitute a failure to act in good faith; however, unless a director honestly believes he is making a reasonable business decision, he fails to act in good faith.
Second, that the defendant failed to act as an ordinarily prudent person in a like *493 position would have acted under similar circumstances. (Unless he has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by
[one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]
[[a lawyer] [a public accountant] [name other outside advisor ] as to the matter(s) the director reasonably believes are within such [professional's] [advisor's] competence]
[a committee of the board of directors of which the director is not a member if he reasonably believes the committee merits confidence].)
Third, that the defendant failed to act in a manner he reasonably believed to be in the best interests of the corporation.
And Fourth, that the defendant's [acts] [omissions] proximately caused damage to the plaintiff. Proximate cause is a cause which in a natural and continuous sequence produces a person's damage and is a cause which a reasonable and prudent person could have foreseen would probably produce such damage or some similar injurious result. There may be more than one proximate cause of damage. Therefore, the plaintiff need not prove that the defendant's acts were the sole proximate **158 cause of the damage. The plaintiff must prove, by the greater weight of the evidence, only that the defendant's acts were a proximate cause.
Finally, as to the (state number ) issue on which the plaintiff has the burden of proof, if you find by the greater weight of the evidence that the plaintiff was damaged by the failure of the defendant to discharge his duties as a corporate director, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.
If, on the other hand, you fail to so find, then it would be your duty to answer this issue "No" in favor of the defendant.
(Footnotes omitted.) The parties discussed whether the trial court should instruct the jury in accordance with defendant's request at length during the jury instruction conference.
When the "safe harbor" defense initially came up for discussion, defendant's trial counsel argued that N.C.G.S. § 55-8-30 "trumps, if you will, [ N.C.G.S. § 78A-56(c) ] and that [ N.C.G.S. § 78A-56(c) ] dovetails back to it" because "(c) is saying that" "our duty is to ensure that they acted reasonably in their capacities and so forth." In view of the fact that "there are no pattern instructions on this," defendant's trial counsel stated that he "simply went back to the breach of corporate duties with respect to [N.C.G.S. §] 55-8-30, and this is the pattern jury instruction that came from that" and "needs to be inserted."
After noting that N.C.G.S. § 78A-56 "specifically is dealing with the sale of securities as opposed to just your general obligations as a director of a corporation," the trial court asked defendant's trial counsel "[w]hy does [Chapter] 55 [of the North Carolina General Statutes] apply to this at all?" In response, defendant's trial counsel stated that, "of course, the allegation is" "a breach of [ N.C.G.S. § 78A-56(a)(2) ]," which "talks about so long as the defendants sustain the burden of proving that their actions were reasonable and so forth," with N.C.G.S. § 78A-56(c) "specifically talk[ing] about directors being responsible" "for these kinds of sales activity" unless the director was "riding herd over and making sure [sales employees] didn't do something they weren't supposed to do." According to defendant's trial counsel, directors would not be liable as long as "they conduct themselves in the manner that a reasonable-a[n] ordinary care director should do," with N.C.G.S. § 55-8-30 being "where that is articulated."
**159 At that point, the trial court interjected that "my reading of" N.C.G.S. § 55-8-30 "will place the burden [of] proof on the plaintiff," while his "reading of [Chapter 78A of the General Statutes] puts the burden of proof on you." In response, defendant's trial counsel stated that "[t]hen what we might need to do is" provide "something [to] read to the jury members that talks about that burden *494 and the fact that these defendants would be relieved from this offense if [ ] they acted accordingly" and that "if [N.C.P.I. Civil] 807.50 imposes too harsh, perhaps we can craft something." When the trial court pointed out that defendant's proposed liability-related special instructions appeared to be an "accurate statement of the law as far as the defenses available to [defendant] under" N.C.G.S. § 78A-56(a)(2) are concerned "[b]ecause it accurately states that the burden of proof is on you," defendant's trial counsel said "[r]ight"; noted that he "was just trying to get an option that the jury says, okay, we find that they carry that burden of proof; therefore we can't find them culpable"; and added that "I'm certainly in agreement with you relative to the statute and the reliance issues, but on the other hand, relative to the defenses of reasonable behavior and the fact that they're corporate directors, it certainly is my opinion that they get off if that's the-if that turns out to be the case."
After agreeing that defendants "get off" "if they sustained their burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the untruth or omission," plaintiffs' counsel argued that the jury simply needed "those two elements" and suggested that "we give them one sentence of what it means to exercise reasonable care" from N.C.P.I. Civil 800.10, which addresses the tort of negligent misrepresentation. Once defendant's trial counsel had agreed that a definition of "reasonable care" would be appropriate "because that is the standard that is in" N.C.G.S. § 55-8-30, the trial court "rule[d] that [defendants] have the burden of proof on that issue" and agreed with plaintiffs' counsel that the appropriate language would be: "First, the defendant did not know of the untruth or omission in offering or sale of a security to the plaintiffs; or, second" "that the defendant in the exercise of reasonable care could not have known of the untruth or omission." At that point, the trial court and counsel for the parties discussed the wording of the issues to be submitted to the jury, with defendant's trial counsel agreeing with the wording of the "reasonable care" issue and with the placement of the burden of proof with respect to that issue upon defendants as proposed by the trial court and plaintiffs' counsel. At the conclusion of the day's proceedings, the trial court agreed to prepare a set of draft instructions and to provide them to counsel for both parties on the understanding that "we'll have a brief hearing Monday morning"
**160 and "get that hammered out" so "you'll know what the instructions are before you make your closings."
At the time that the proceedings convened on the following Monday, the trial court afforded defendant's trial counsel an opportunity "to put [his] objections [ ] on the record" before noting that "you have submitted to the Court written requests for instructions and I have denied those." In response to the trial court's invitation, defendant's trial counsel stated that:
If Your Honor, please, the defendants have requested then in the instruction from the Court that pertains or arises out of Chapter 55 pertaining to members of the board of directors and the various responsibilities they have in performing their duties, and one of which that we specifically requested related to the fact that board of director members could rely upon statements that are made to them and they would, therefore, not be held responsible.
Let me find the particular reference so that I can state this accurately. And where this comes from is [N.C.G.S. §] 55-8[-]30, and the request that we had made was in regard to [N.C.G.S. §] 55-8[-]30(b)(1), suggesting that in discharging his duties, a director is entitled to rely on information, opinions, reports, or statements including in financial-including financial statements and other financial data if prepared by or presented by one or more officers of-or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.
As I said to the Court, I think that [N.C.G.S. §] 55-8[-]30(c) is parallel to [N.C.G.S. §] 78[A]-56(c)(1) which then goes on to say the director is not entitled to the benefit of this section if he has actual knowledge concerning the matter in question that makes reliance otherwise permitted by [N.C.G.S. §] 55-8[-]30(b) unwarranted.
*495 And then of course what that would require is the same instructions that his Honor has anticipated which will be that-to instruct the jury that if the director himself had knowledge, actual knowledge, concerning the matter, then he would not enjoy the benefit of this particular provision of [N.C.G.S. §] 55-8[-]30(b)(1).
**161 That is in essence, if Your Honor, please, what we had requested of the Court and it's our understanding that you have denied that previously. But again, we just simply want to put that on the record.
I do not have, if Your Honor, please, a copy at this moment in time of the provisions, but I thought we had them the other day, but I have not filed them relative to the proposed jury instruction that I had crafted.
At the conclusion of this statement, the trial court noted that "you handed me up a pleading that was a proposed jury instruction, and feel free to file that until you find another copy" and ruled that "your request for jury instructions as well as your objections to the instructions are noted for the record and are denied." The trial court instructed the jury with respect to the "reasonable care" defense set out in N.C.G.S. § 78A-56(a)(2) that:
The second issue[ ] reads: Did the defendant Gregory Brannon not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the plaintiff Lawrence Piazza.
On this issue, the burden of proof is on the defendant Gregory Brannon. This means that he must prove by the greater weight of the evidence two things:
First, that the defendant Gregory Brannon did not know of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza; and, second, that the defendant Gregory Brannon in the exercise of reasonable care could not have known of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza.
Reasonable care means that degree of care, knowledge, intelligence, or judgment which a prudent person would use under the same or similar circumstances. Thus, on this second issue on which the defendant Gregory Brannon bears the burden of proof, if you find by the greater weight of the evidence, first, that Gregory Brannon did not know of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza; and, second, that Gregory Brannon in the exercise of reasonable care could not have known of the untruth or omission in the offering or sale of a security to the **162 plaintiff Lawrence Piazza, then it would be your duty to answer the second issue yes in favor of the defendant Gregory Brannon.
If on the other hand you find that the defendant Gregory Brannon has failed to prove each of these requirements by the greater weight of the evidence, then it would be your duty to answer this issue no in favor of the plaintiff Lawrence Piazza.[11]
Defendant's trial counsel did not lodge any additional objections when given an opportunity to do so at the conclusion of the trial court's instructions to the jury.
After carefully reviewing the record, we are not satisfied that defendant properly preserved his challenge to the trial court's refusal to give an explicit "safe harbor" instruction to the jury for purposes of appellate review. As an initial matter, we believe that the "safe harbor" defense, assuming, without deciding, that it is applicable to cases like this one,[12] was a subordinate feature of the present case given that N.C.G.S. § 78A-56(a)(2) absolves individuals alleged to have taken reasonable care from liability for the making of materially false and misleading statements and given that reasonable care could obviously include appropriate reliance upon information supplied by other corporate officials. As this case *496 was presented to the jury, the extent to which defendant was or was not acting as a director when he made the disputed statements to plaintiffs was not an essential element of plaintiffs' claims against defendant. Instead, both parties consented to the submission of this case to the jury on the implicit theory that the capacity in which defendant acted when he made the allegedly false and misleading statements was not relevant to the jury's liability-related decision. In light of that fact, the relevant issue was whether defendant was able to persuade the jury that "he did not know, and in the exercise of reasonable care could not have known, of the untruth or omissions," N.C.G.S. § 78A-56(a)(2), regardless of the capacity in which he was acting when he made the allegedly false statements to plaintiffs. The trial court discussed the "reasonable care" issue in detail in the instructions that were given to **163 the jury, using both the relevant statutory language and additional language drawn from the pattern jury instruction relating to negligent misrepresentation claims, upon which the parties seemed to agree. Given that the trial court's instructions with respect to the "reasonable care" issue explained the nature of the decision that the jury was required to make and the basic legal principles that the jury was required to apply in deciding whether defendant should be absolved from liability on "reasonable care" grounds, we are persuaded that the requested "safe harbor" instruction, which would only become relevant if the jury made a separate determination that defendant was acting as a director at the time that he made the challenged statements to plaintiffs, involved a subordinate feature of the case. As a result, unless defendant made an adequate written request for the delivery of a "safe harbor" instruction, the trial court did not err by omitting any reference to the "safe harbor" principles enunciated in N.C.G.S. § 55-8-30 from its instructions to the jury in this case.
Moreover, we are unable to conclude that defendant submitted an adequate written request for the delivery of a "safe harbor" instruction for the trial court's consideration. The written instruction that defendant submitted for the trial court's consideration contained a great deal of information that was totally irrelevant to the issues that were actually before the trial court and jury in this case. In addition, even if one overlooks the differing context that defendant's written request for instructions was intended to address and the extraneous material that it contained, defendant's proposed instruction placed the burden of proof upon plaintiffs rather than upon defendant even though defendant's trial counsel appears to have conceded (or at least did not explicitly object to the trial court court's determination) during the jury instruction conference that defendant, rather than plaintiffs, bore the burden of proof with respect to this issue. Moreover, defendant never appeared to acknowledge during the jury instruction conference that, for the "safe harbor" protection to be available to defendant, the jury would have had to make a preliminary determination that defendant was acting as a director, rather than in some other capacity, when he made the challenged statements to plaintiffs. As a result, for all of these reasons, we cannot conclude that defendant submitted a sufficiently accurate written request for the delivery of a "safe harbor" instruction to properly preserve the issue of the trial court's failure to deliver such an instruction to the jury for purposes of appellate review.
Although defendant did attempt to clarify the nature of his request for the delivery of a "safe harbor" instruction during the jury instruction **164 conference, his efforts in that regard do not suffice to overcome his failure to submit an adequate written request for the trial court's consideration. Instead of submitting a written request for instructions that excluded extraneous information, required the jury to find that defendant was acting in his capacity as a director as a prerequisite for the availability of the "safe harbor" defense, and accurately inserted the relevant "safe harbor" language into the context of the "reasonable care" defense recognized by N.C.G.S. § 78A-56(a)(2), defendant simply provided the trial court with a written request for instructions that surrounded a limited amount of potentially relevant information with a great deal of irrelevant information and placed the burden of proof on plaintiffs despite defendant's trial *497 counsel's apparent concession during the jury instruction conference to the contrary during the jury instruction conference. Although defendant's trial counsel attempted to orally explain how his requested instruction could be modified to make it correct during the course of the charge conference, he never submitted a proposed modification in writing. The entire purpose of the written request requirement relating to subordinate features of the case contained in N.C.G.S. § 1A-1, Rule 51(b) is to prevent trial judges from having to do what defendant sought to have the trial court do in this case-create a new instruction based upon general language contained in a much more extensive instruction that needed to be changed in a number of significant ways. As a result, for all of these reasons, we hold that the trial court was entitled to reject defendant's request for the delivery of a "safe harbor" instruction to the jury on the grounds that defendant failed to submit a proper written request for such an instruction.
C. Primary Liability and Scienter
Finally, defendant argues that he is entitled to a new trial on the grounds that the jury's verdict finding him liable to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2) is contrary to law given that a finding of liability under that statutory provision requires proof that he either owned the securities that plaintiffs purchased or acted with scienter when he solicited funds from plaintiffs for Neogence. In support of his argument, defendant relies upon the plain statutory language, which imposes liability upon a person who "[o]ffers or sells" that security by means of false or misleading statements. In defendant's view, allowing the imposition of liability under N.C.G.S. § 78A-56(a)(2) upon a non-owner would conflict with the language in which the statute is couched, including the provision requiring a successful plaintiff to tender the relevant security to the defendant as a precondition for recovering the purchase price. According to defendant, allowing recovery against a non-owner would **165 be "nonsensical" given that a successful plaintiff would be required to tender the relevant security to a person from whom it was not procured.
In the event that plaintiffs sought to have defendant held liable for their Neogence-related losses, defendant contends that they should have proceeded against him pursuant to N.C.G.S. § 78A-8(2), which imposes liability on "any person, in connection with the offer, sale or purchase of any security, directly or indirectly," who made fraudulent representations upon which plaintiffs relied in deciding to invest in Neogence. In the alternative, defendant suggests that plaintiffs should have sought to have him held "secondarily liable" as a "control person" pursuant to N.C.G.S. § 78A-56(c), an approach that would have required plaintiffs to establish Neogence's "primary liability" pursuant to N.C.G.S. § 78A-56(a). Defendant believes that he "cannot be primarily liable under" N.C.G.S. § 78A-56(a)(2) in the absence of a determination that Neogence, "[t]he only person who could be primarily liable under the statute - and who could be a proper party to make good through the rescission required under Section 56(a)(2)," was primarily liable.
Finally, defendant contends that a finding that he was liable to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2) required a determination that he acted with scienter. Defendant reaches this conclusion by reference to decisions construing Section 12(2) of the Securities Act of 1933, upon which N.C.G.S. § 78A-56(a)(2) was based and which requires a finding that the defendant acted with scienter in offering or selling the securities in question, citing Pinter v. Dahl , 486 U.S. 622, 647, 108 S. Ct. 2063, 2078, 100 L.Ed.2d 658, 682 (1988). Although defendant acknowledges that neither the United States Supreme Court nor this Court has definitively identified the elements that had to be established for purposes of a claim asserted pursuant to either Section 12(2) of the Securities Act or N.C.G.S. § 78A-56(a)(2), he contends, in further reliance upon the rule of lenity, that "the jury should have been required to find that Dr. Brannon was either a securities owner or 'motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' " citing Pinter , 486 U.S. at 647, 108 S. Ct. at 2078, 100 L.Ed.2d at 658, and State v. Williams , 98 N.C. App. 274, 279, 390 S.E.2d 746, 749, disc.
*498 rev. denied , 327 N.C. 144, 394 S.E.2d 184 (1990), in support of this assertion.
In response, plaintiffs argue that defendant waived his right to advance this argument on appeal given that his trial "counsel requested the very instruction" of which he now complains and is now "complain[ing] of the action which he induced," quoting Frugard v. Pritchard , 338 N.C. 508, 512, 450 S.E.2d 744, 746 (1994). In addition, plaintiffs contend that, because defendant failed to raise this argument **166 until after the trial had been completed, he is not entitled to advance it on appeal from the denial of his new trial motion given that N.C.G.S. § 1A-1, Rule 59(a)(8), limits a trial court's authority to award a new trial to situations involving "[e]rror in law occurring at the trial and objected to by the party making the motion"; that North Carolina Rule of Appellate Procedure 10(a)(1) provides that an issue is not properly preserved for purposes of appellate review absent "a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make" at trial; and that N.C. Rule App. P. 10(a)(2) prohibits a party from "mak[ing] any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection."
In response, defendant argues that, because the issue of whether he had failed to properly preserve his challenge to the trial court's primary liability instructions and failure to require a finding of scienter for purposes of appellate review was not mentioned in the dissenting opinion at the Court of Appeals or advanced in a petition seeking discretionary review of additional issues, plaintiffs' non-preservation argument is not properly before us. In addition, defendant contends that the alleged error constitutes "a flaw that reaches beyond the instructions issued to the jury," "is a fundamental error," and is "simply inconsistent with the statutory scheme." As a result, defendant contends that his challenge to the trial court's primary liability instruction and the trial court's failure to require a finding of scienter was properly advanced by means of a motion for a new trial in reliance upon N.C.G.S. § 1A-1, Rule 59(a)(7), which permits the trial court to award a new trial in the event that the jury's "verdict is contrary to law."
During the trial,[13] defendant submitted a written request for instructions in which he asked the trial court to instruct the jury that:
**167 Issue 1 reads: Did the Defendants, in soliciting the Plaintiffs to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiffs were unaware of the true or omitted facts?
....
[A]s to this issue on which the Plaintiffs bear the burden of proof, if you find by the greater weight of the evidence:
First, that the Defendants made a statement to the Plaintiffs which was false or misleading, or which under the circumstances was false or misleading because of the omission of other facts;
*499 Second, that the statement made by the Defendants, or the facts omitted by the Defendants, were material;
Third, that the Plaintiffs were unaware of the true or omitted facts prior to paying money for the security; and
Fourth, that the Defendants made such statement in connection with soliciting the Plaintiffs to pay money for a security, then it would be your duty to answer this issue "Yes," in favor of the Plaintiffs. If, on the other hand, you find that the Plaintiffs have failed to prove each of these requirements by the greater weight of the evidence, then it would be your duty to answer this issue "No," in favor of the Defendants.
During the charge conference, counsel for both sets of parties indicated that they had proposed identical instructions concerning the question of whether defendants had made false and misleading statements to plaintiffs. As a result, the trial court stated "[s]o we all agree that that's a good instruction as to 56(a)(2)" and instructed the jury concerning the issue of whether defendants had made false or misleading statements **168 in violation of N.C.G.S. § 78A-56(a)(2) in accordance with the language that had been requested by the parties.
This Court has "consistently denied appellate review to [parties] who have attempted to assign error to the granting of their own requests." State v. Wilkinson , 344 N.C. 198, 213, 474 S.E.2d 375, 383 (1996) ; see also State v. McPhail , 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991) (stating that a litigant "will not be heard to complain of a jury instruction given in response to his own request" (citations omitted)).[14] Having urged the trial court to instruct the jury in exactly the manner that it instructed that body with respect to the "false and misleading" statement issue, defendant invited any erroneous finding of liability that might that have resulted from those instructions. Frugard , 338 N.C. at 512, 450 S.E.2d at 746 (stating that "[a] party may not complain of action which he induced"). As a result, defendant is not entitled to relief from the trial court's judgment and orders on the basis of his primary liability and scienter claims.[15]
III. Conclusion
As a result, for all of the reasons stated above, we hold that the Court of Appeals did not err by affirming the challenged judgment and orders.[16] As a result, the Court of Appeals' decision, as modified in this opinion, is affirmed.
MODIFIED AND AFFIRMED.
Justices EARLS and DAVIS did not participate in the consideration or decision of this case.

We will refer to defendant Gregory Brannon as defendant throughout the remainder of this opinion.

N.C.G.S. § 78A-56(a)(2) imposes civil liability upon anyone who:
Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.
N.C.G.S. § 78A-56(a)(2) (2017).

The trial court, without objection from defendant, instructed the jury that "a statement or omission is material if the information disclosed or the information omitted would have assumed actual significance in the deliberations of a reasonable investor" and that "the plaintiffs do not need to prove that they relied on the false or misleading information defendants provided, or what significance they attributed to that information." Defendant did not object to this instruction before the trial court or challenge it in any way before either this Court or the Court of Appeals, and we express no opinion concerning its correctness. Similarly, defendant has not argued before this Court that his new trial motion should have been allowed or that he is otherwise entitled to relief because plaintiffs knew or should have known of the "true facts" or that plaintiffs did not or should not have reasonably relied upon defendant's representations. "The scope of review on appeal is limited to issues so presented in the several briefs." N.C. R. App. P. 28(a).

Similarly, we have also determined that, "[w]hen a judgment has been entered on seemingly inconsistent findings of fact, it is the duty of the reviewing court to reconcile the findings and uphold the judgment if practicable." Davis v. Ludlum , 255 N.C. 663, 666, 122 S.E.2d 500, 502 (1961) (citing Bradham v. Robinson , 236 N.C. 589, 593, 73 S.E.2d 555, 558 (1952) ).

The term "OEM" means that the application or software is a default application pre-installed on the smartphone.

Unlike Mr. Rice, defendant did not testify at trial.

Although an examination of Dr. Piazza's cell phone bills indicated that he and Mr. Rice communicated via text message or telephone calls on several occasions between 2 May 2010 and 24 May 2010, the record does not contain any information concerning the nature and content of these communications.

The jury might have also deemed it significant that the parties had stipulated to the fact that, "[i]n mid-July 2010, [Mr.] Lampuri was invited to Neogence to preview a demonstration of Mirascape" at which Mr. "Cummings told [Mr.] Lampuri that Neogence had a chance for an opportunity with Mirascape to become an 'OEM' product for installation on Verizon smartphones based upon his prior meeting(s) and/or conversations with Verizon employees or agents" while entering into no similar stipulation concerning the statements that Mr. Rice made to Mr. Lampuri.

Defendant has not advanced any argument in reliance upon the common law business judgment rule in the proceedings before this Court.

"To the extent these cases suggest the court must apply the law to the evidence, they have been overruled by the 1985 amendments to [N.C.G.S. § 1A-1,] Rule 51." 2 G. Gray Wilson, North Carolina Civil Procedure § 51-3, at 51-8 n.52 (3d ed. 2007).

The trial court delivered an essentially identical "reasonable care" instruction with respect to the issue of defendant's liability to Mr. Lampuri.

We should not, of course, be understood as expressing any opinion concerning the extent to which the trial court would have erred had defendant submitted a proper written request for instructions concerning the director safe harbor issue for the trial court's consideration.

We are not persuaded by defendant's argument that plaintiffs are not entitled to challenge the extent to which defendant is entitled to raise his primary liability and scienter claims for purposes of appellate review because defendant invited any error that the trial court may have committed or waived the right to argue that issue because it was not addressed in either the majority or dissenting opinions before the Court of Appeals. In our view, the extent to which an issue that is before us by means of a dissent or the allowance of a discretionary review or certiorari petition involves invited error or has been properly preserved for purposes of appellate review is inherently intertwined with defendant's related substantive claim, In re R.L.C ., 361 N.C. 287, 290-91, 643 S.E.2d 920, 921-22, cert. denied , 552 U.S. 1024, 128 S. Ct. 615, 169 L.Ed.2d 396 (2007), and is, for that reason, not the sort of separate and independent substantive claim that the Court refused to consider in North Carolina School Boards Ass'n v. Moore , 359 N.C. 474, 506-07, 614 S.E.2d 504, 523-24 (2005). In view of this determination, plaintiffs' request for certiorari review of the issue of whether defendant invited any error that the trial court may have committed or properly preserved his primary liability and scienter claims for purposes of appellate review is dismissed as moot.

The issue before the Court in Justus v. Rosner , 317 N.C. 818, 824-28, 821 S.E.2d 765, 769-72 (2018), was the appropriateness of the trial court's decision to grant a new trial on the grounds that the jury's verdict was contrary to the greater weight of the evidence pursuant to N.C.G.S. § 1A-1, Rule 59(a)(7) rather than a challenge to the trial court's instructions to the jury.

In light of our decision to refrain from reaching the merits of defendant's contentions that he could not be held liable to plaintiffs because he was not the seller of the securities in question, that defendant could not be held primarily liable to plaintiffs, and that defendant could not be held liable to plaintiffs in the absence of a finding of scienter, we express no opinion concerning the merits of any of these contentions.

In view of the fact that defendant's challenge to the trial court's attorneys' fee award rested upon his contention that he was entitled to a new trial based upon the other alleged errors discussed in the text of this opinion and the fact that we have determined that defendant is not entitled to relief from the trial court's judgment and orders on the basis of those arguments, there is no need for us to discuss the attorneys' fee issue further in this opinion.