Zhang v. CapitalNexus, LLC, 2026 NCBC 59.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV055589-590

HUI ZHANG; JING ZHANG; and
CHARLOTTE HARRIS CORNER'S
MARRIOTT HOTEL INVESTORS
FUND LP,

Plaintiffs,

v.

CAPITALNEXUS, LLC; TAO
"TONY" ZHANG; MJM GROUP
MANAGERS, INC.; ANUJ N.
MITTAL; VINITA J. MITTAL; MJM
GROUP LLC; AVIVAR
HOSPITALITY, LLC; QC VANTAGE
INVESTMENT PARTNERS, LLC;
CLT AIRPORT ALOFT EB-5 LP;
NOVUS DEVELOPMENT GROUP
LLC; STERLING HOLDINGS, LLC;
ATHENA HOLDINGS COMPANY
LLC; LOTUS HOLDINGS, LLC; IRIS
HOTEL HOLDING, LLC,

Defendants.

**ORDER AND OPINION
ON MOTIONS TO DISMISS**

1. This complex case arises out of a failed hotel development in Charlotte, North Carolina. The plaintiffs are Chinese citizens who invested in the project in connection with the federal government's EB-5 immigration program, which allows foreign citizens to obtain permanent residency in the United States. Having lost most of their investments (and worried about their immigration status), they now accuse a host of individuals and entities of fraud, self-dealing, breach of contract, and related misconduct. The defendants' motions to dismiss are pending. For the following reasons, the Court **GRANTS in part** and **DENIES in part** each motion.

*Spengler & Agans PLLC, by Eric Spengler, for Plaintiffs Jing Zhang and Hui Zhang.*

*Cranfill Sumner LLP, by Rebecca A. Knudson, Mica Nguyen Worthy, Taylor Sumner Sweet, and Dakota Lipscombe, for Defendants QC Vantage Investment Partners, LLC, Novus Development Group LLC, Athena Holdings Company LLC, CapitalNexus, LLC, and Tao "Tony" Zhang.*

*Morningstar Law Group, by Christopher T. Graebe and John William Graebe, for Defendants CLT Airport Aloft EB-5 LP, Lotus Holdings, LLC, Iris Hotel Holding, LLC, MJM Group Managers, Inc., Anuj Mittal, Vinita Mittal, MJM Group, LLC, and Avivar Hospitality, LLC.*

*Whelehan Law Firm, LLC, by Rory D. Whelehan, for Defendant Sterling Holdings, LLC.*

*No counsel appeared for Nominal Party Charlotte Harris Corner's Marriott Hotel Investors Fund LP.*

Conrad, Judge.

## I.
## BACKGROUND

2. The second amended complaint contains nearly 500 paragraphs detailing fourteen claims for relief asserted by two plaintiffs against fifteen defendants. Wading through the mass of allegations is not a task for the faint of heart. In the background that follows, the Court has done its best to identify the key players and summarize the disputed transactions, assuming all the while that the allegations are true.

3. Plaintiffs Hui Zhang ("Hui") and Jing Zhang ("Jing") are Chinese citizens. Hui is a homemaker and former accountant. Jing is a teacher. Neither Hui nor Jing speaks English, though both studied the language in school during their formative years. (*See* 2d Am. Compl. ¶¶ 1, 2, 34–36, ECF No. 55.)

4.     Through a friend, Hui met Defendant Tony Zhang ("Tony") in late 2016. She introduced Jing to Tony a few months later. Tony resides in North Carolina and has experience with the federal government's EB-5 immigration program. At the risk of oversimplifying what is undeniably a complex set of laws, the EB-5 program allows a foreign citizen to apply for permanent residency in the United States—popularly known as a green card—if he or she invests in a business that creates jobs for American workers. (*See* 2d Am. Compl. ¶¶ 28–31, 37, 38.)

5.     Tony gave Hui and Jing a promotional brochure describing an EB-5 investment opportunity in Charlotte, North Carolina. Written in Chinese, the brochure outlines a plan to develop a hotel (Northlake Hotel) using a combination of bank loans, EB-5 investments by foreign citizens, and capital contributed by the developer (identified as MJM Group[1]). According to the brochure, Tony and MJM Group had already developed at least three successful hotels, and this new project offered a reliable path to a green card and financial gain. The brochure identifies Tony as "Director, Foreign Investments" of MJM Group. (*See* 2d Am. Compl. ¶¶ 39, 41, 44–49.)

6.     As they weighed whether to invest, Hui and Jing asked Tony about the risk involved and pointed to their inability to speak English. Tony allegedly downplayed the risk, assuring them that their investment principal would be protected. He also promised to translate documents as needed. (*See* 2d Am. Compl. ¶¶ 50, 51, 53.)

---

[1] The second amended complaint uses the words "Developer" and "MJM" to refer to four affiliated entities: MJM Group Managers, Inc.; MJM HC Hotel Managers 4 LLC; MJM Real Estate Group, LLC; and MJM Group LLC. (2d Am. Compl. ¶ 12.)

7.     In March 2017, Tony sent Hui and Jing a 99-page batch of English-language legal documents, including an offering memorandum, subscription agreement, and partnership agreement.  The offering memorandum describes the investment in detail.  Defendant Avivar Hospitality, LLC ("Avivar") was named as the owner and operator of Northlake Hotel.  Avivar's majority member would be MJM Group Managers Inc., a company owned by Defendants Anuj and Vinita Mittal ("the Mittals").  The minority member would be Charlotte Harris Corner's Marriott Hotel Investors Fund LP ("Charlotte Harris").  Defendant CapitalNexus, LLC, a company closely held by Tony, would serve as Charlotte Harris's general partner, and prospective EB-5 investors could participate in the project by paying $500,000 to become limited partners. (*See* 2d Am. Compl. ¶¶ 1–4, 9–12, 39, 43; Compl. Ex. 3, ECF No. 4.3.)

8.     The offering memorandum warns prospective investors that "[t]here is no guarantee that an Investor will receive either a return *of* his or her investment, or a return *on* his or her investment."  The documents also encourage prospective investors to seek independent counsel and to obtain translations if unable to read and understand English.  (Compl. Ex. 3 at 5, 11, 40, 87 (emphasis in original).)

9.     A few days later, Tony followed up with a one-page summary ("Investment Summary") of the offering memorandum in Chinese.  The Investment Summary includes a section titled "Project Highlights" that states, in part, that "[i]nvestors will receive a fixed 5% dividend annually, and upon the completion of obtaining the green card, investors will receive a repayment of $500,000 principal!"  Another section titled

"Application Process" lists four steps in the process for obtaining a green card. (*See* 2d Am. Compl. ¶¶ 54, 57, 58; Compl. Ex. 4 ["Investment Summary"], ECF No. 4.4.)

10. After receiving these documents, Hui and Jing asked Tony for complete translations. Tony instead referred them to the promotional brochure and the Investment Summary. He also promised to meet them in person in China for the purpose of putting certain terms into a separate, Chinese-language document ("Investment Memo"). At that point, Hui and Jing signed the offering memorandum despite not having read it and not having obtained a translation. Several weeks later, Tony, Hui, and Jing met in China as planned and signed the Investment Memo. This document includes the following statement: "Regardless of the reason, before an investor obtains permanent residency and within 180 days of applying for withdrawal, the $500,000 investment capital and dividends . . . will be refunded to the investor's account." (2d Am. Compl. ¶¶ 59–61, 63; Compl. Ex. 6 ["Investment Memo"], ECF No. 4.6.)

11. In June 2017, Hui wired $500,000 to Charlotte Harris's bank account. In July 2017, Jing did so as well. Each also paid a $45,000 management fee. Their initial immigration petitions were filed almost immediately. (*See* 2d Am. Compl. ¶¶ 70, 71.)

12. According to Hui and Jing, it was all downhill from there, starting with an amendment of Avivar's operating agreement in early 2018 that disfavored Charlotte Harris and its EB-5 investors. Among other things, the amendment gave Anuj Mittal virtually unfettered managerial control, authorized a sizeable project management

fee for the Mittals, permitted interim distributions to entities controlled by Tony and the Mittals, and restricted Charlotte Harris's economic rights. The amendment also coincided with a reshuffling of Avivar's membership. In addition to Charlotte Harris, Avivar's original members included MBIL LLC ("MBIL") and MJM HC Hotel Managers 4 LLC ("MJM HC"), not MJM Group Managers Inc. as stated in the offering memorandum. MBIL transferred its interest to Defendant Sterling Holdings, LLC ("Sterling"), and MJM HC transferred its interest to the Mittals. Meanwhile, one of Tony's closely held companies—QC Vantage Investment Partners, LLC ("QC Vantage")—became a member as well. Hui and Jing were unaware of the amendment to Avivar's operating agreement and the changes to its membership. (*See* 2d Am. Compl. ¶¶ 131, 146, 147, 160, 161.)

13.    As alleged, Tony and the Mittals made these changes with an eye toward selling Northlake Hotel even before it opened. Anuj Mittal supposedly agreed to sell the hotel for $39 million, but the sale fell through when the buyer backed out. Hui and Jing, who did know about this, believe that the sale would have conflicted with EB-5 regulations and would have jeopardized their immigration status. (*See* 2d Am. Compl. ¶¶ 154, 155, 159.)

14.    In June 2018, Northlake Hotel opened. In early 2019, Tony told the EB-5 investors that the hotel had created enough jobs to qualify for the EB-5 program. And by the end of 2019, Tony reported to investors that the hotel was profitable. (*See* 2d Am. Compl. ¶¶ 73, 74.)

15.     Despite these positive reports, Avivar obtained a $9 million loan from Access Point in late 2019, ostensibly to cover budget overruns. But Hui and Jing believe that the loan served other purposes. They allege that Avivar was low on cash because the Mittals never contributed capital to the company as promised and paid themselves excessive developer fees, recklessly reducing working capital. (*See* 2d Am. Compl. ¶¶ 166, 168, 169.)

16.     A major corporate restructuring followed in January 2020, again without the EB-5 investors' knowledge. Through this restructuring, Charlotte Harris ceased to be a member of Avivar and obtained new interests in Defendants Lotus Holdings, LLC ("Lotus") and Iris Hotel Holdings, LLC ("Iris"). Lotus acquired sole membership in Avivar plus sole membership in a second company that also owned and operated a hotel. Lotus supposedly paid about $2 million for Avivar's entire membership interest, but only Tony and the Mittals received any of the proceeds. Iris similarly held sole membership in two companies, each of which owned and operated a hotel. As a result, Charlotte Harris had indirect interests in four hotels, including Northlake Hotel, that were developed by Tony and the Mittals. (*See* 2d Am. Compl. ¶¶ 172, 166, 178, 186.)

17.     Charlotte Harris lost more than it gained in these transactions, say Hui and Jing. Charlotte Harris was allegedly treated as a second-class member: it was given nonvoting units, and upon the sale of any of the hotels in the portfolio, it would be paid last. The other members included several companies owned by Tony and the Mittals, all of which received preferential treatment. For example, one of the Mittals'

companies—Zion Hotel Fund IV, LLC ("Zion")—obtained distribution priority and complete control over Iris. (*See, e.g.*, 2d Am. Compl. ¶¶ 192–96, 249, 251, 252, 254.)

18. Perhaps more worrying for Hui and Jing, the restructuring potentially jeopardized their immigration status. Their view is that the EB-5 investors' funds were to be used only for Northlake Hotel, both because Charlotte Harris's partnership agreement required as much and because that was the basis for the investors' immigration petitions. They fault Tony for failing to consult an attorney to ensure compliance with immigration regulations. (2d Am. Compl. ¶¶ 173–76, 248, 457, 459.)

19. Just weeks after Charlotte Harris exchanged its interest in Avivar for interests in Iris and Lotus, Tony spoke with Hui and Jing. He mentioned a proposal to merge Northlake Hotel with another hotel, without telling them that a broader restructuring had already occurred. (*See* 2d Am. Compl. ¶¶ 77–82.)

20. In March 2020, the COVID-19 pandemic began. Avivar immediately defaulted on its loans. In a letter to secured lenders, Anuj Mittal explained that "we must conserve available cash to maintain the underlying asset, and to the extent possible, our trained and capable staff through this crisis." As alleged, though, Avivar did not conserve cash and instead continued to make distributions to the Mittals. Then, in June 2020, Avivar gave Sterling a sweetheart deal, paying it a large sum of cash and converting its equity stake into debt guaranteed by Lotus. This left Avivar in a precarious position and put Sterling at an advantage over other members, including Charlotte Harris. (2d Am. Compl. ¶¶ 206, 209, 210, 212.)

21.  Around this time, Tony contacted the EB-5 investors and cautioned that the pandemic would likely delay dividends for two or three years.  He also mentioned a potential "asset restructuring and asset optimization" but gave no explanation and again did not disclose the earlier changes in Charlotte Harris's assets.  Included in his report were rental rates and other information about Northlake Hotel and three other Marriott hotels.  (2d Am. Compl. ¶¶ 79, 80.)

22.  Things soon went from bad to worse.  In August 2020, Access Point filed suit over the loan default, and Avivar then entered Chapter 11 bankruptcy.  Lotus, as Avivar's sole member, authorized the bankruptcy filing.  According to Hui and Jing, the bankruptcy was unnecessary and occurred only because Tony and the Mittals had taken large, impermissible distributions, thereby depleting Avivar's cash reserves. (*See* 2d Am. Compl. ¶¶ 216, 217, 222.)

23.  Tony sent another update to the EB-5 investors in November 2020.  He said nothing about the bankruptcy, instead reporting that he and the Mittals had contributed an additional $500,000 each (which was allegedly false) and that there was an agreement with an unspecified bank to restructure outstanding debt.  He also discussed a proposed consolidation of Northlake Hotel and three other Marriott hotels into a new company called Athena Holdings Company, LLC ("Athena").  This proposed consolidation never took place, although filings in the bankruptcy proceeding suggest that it was under serious contemplation.  Hui and Jing also allege that they later discovered a transfer of $50,000 from Charlotte Harris to Athena, for

which Charlotte Harris received nothing in return. (*See* 2d Am. Compl. ¶¶ 81–83, 218, 219; Compl. Ex. 8, ECF No. 4.8.)

24. In April 2021, Iris's two subsidiaries filed for bankruptcy, just as Avivar had the previous August. Hui and Jing allege that these bankruptcies were unnecessary, again driven by improper distributions to Tony and the Mittals. As the bankruptcies moved forward, Tony demanded that Iris return Charlotte Harris's capital contribution, but the demand was refused. Later, Tony lodged an objection on Charlotte Harris's behalf, which the bankruptcy court overruled for lack of standing. Ultimately, Iris's subsidiaries liquidated the two hotels that they owned, and Charlotte Harris did not receive any of the proceeds. (*See* 2d Am. Compl. ¶¶ 260, 261, 264, 271.)

25. Meanwhile, it seems that Avivar's bankruptcy proceeding was hotly contested. Access Point, as the largest secured creditor, opposed the original plan of reorganization on the ground that it would have allowed Tony and the Mittals to keep $3 million in ill-gotten distributions. Internally, a disagreement arose between Tony and Anuj Mittal about whether to keep or sell Northlake Hotel. Eventually, in mid-2021, Avivar sought and obtained the bankruptcy court's approval to sell Northlake Hotel. Access Point then withdrew its objection and received the bulk of the sale proceeds. In April 2022, the bankruptcy court dismissed the proceeding and authorized Avivar to pay its unsecured creditors. Sterling was among those that received at least a partial return. Charlotte Harris, however, received nothing and

never participated in the bankruptcy proceeding. (*See* 2d Am. Compl. ¶¶ 224, 227, 232, 233, 246, 247.)

26. It was not until December 2021 that Tony told Hui and Jing about the bankruptcy. Tony claimed that he had tried to block the bankruptcy and that he was "currently seeking potential investment recovery." But by that point, Northlake Hotel had already been liquidated. A few weeks later, Tony asserted that Charlotte Harris's investment had been transferred out of Northlake Hotel and into a different hotel (Residence Inn Steele Creek Hotel). An immigration attorney advised Tony of a "small risk" that these events could derail the EB-5 investors' immigration petitions. (2d Am. Compl. ¶¶ 88, 93, 94, 234, 235, 248.)

27. In May 2022, Hui and Jing asked for a refund of their principal investment, plus dividends. The investment was not returned. (*See* 2d Am. Compl. ¶¶ 96, 97.)

28. As the bankruptcy proceedings played out, the relationship between Tony and the Mittals deteriorated. Over the course of late 2021 and early 2022, they filed multiple lawsuits against one another, which included claims by Charlotte Harris against Iris. The hostilities ended in a global, mediated settlement among fourteen parties, including Tony, the Mittals, Charlotte Harris, Iris, Lotus, and others. According to Hui and Jing, the settlement was favorable for everyone but Charlotte Harris and the EB-5 investors. Among the settlement's many terms, Charlotte Harris received just $100,000 from the Mittals in exchange for its entire interest in Iris. Worse yet, Charlotte Harris ceded its entire interest in Lotus for nothing. Hui and Jing believe that the settlement allowed Tony and the Mittals to retain millions

of dollars siphoned from Avivar, Iris, and Lotus, while purporting also to grant broad releases to them for all alleged wrongs. (*See* 2d Am. Compl. ¶¶ 263, 264, 269, 278, 279, 281(b),(f); 2d Am. Compl. Ex. 22, ECF No. 55.2.)

29. By the end of 2022, Charlotte Harris had no ongoing interest in Northlake Hotel or any other hotel, and its only assets included the $100,000 received for its interest in Iris. In April 2023, Tony invested that money in a coffee shop, without first consulting Hui, Jing, and the other EB-5 investors. He also purported to amend the partnership agreement to broaden Charlotte Harris's business purpose to go beyond the development of Northlake Hotel. Charlotte Harris's year-end tax returns for 2022 showed a loss of $7.9 million with corresponding losses for each EB-5 investor. (*See* 2d Am. Compl. ¶¶ 290, 293–96.)

30. In late 2024, Hui and Jing filed this lawsuit. They allege that they have lost their investments and that Charlotte Harris's switch from hotel development to coffee-shop investment has endangered their chances of obtaining green cards. Tony, the Mittals, and their related companies have, by contrast, allegedly received a windfall from one-sided distributions, excessive fees, and other instances of self-dealing. In their second amended complaint, Hui and Jing assert a mix of individual claims and derivative claims on behalf of Charlotte Harris. (*See* 2d Am. Compl. ¶¶ 304, 305, 307, 313.)

31. The fifteen named defendants can be broken into three groups. First, the CapitalNexus Defendants include Tony Zhang, CapitalNexus, QC Vantage, Novus, and Athena. Second, the Mittal Defendants include Anuj Mittal, Vinita Mittal,

Avivar, Lotus, Iris, MJM Group, MJM Group Managers, and CLT Airport Aloft Eb-5 LP. Third, Sterling stands apart as a group of its own. Notably, the second amended complaint also uses the label "Conspiracy Defendants" to refer to every defendant except Avivar, Iris, and Lotus. (*See* 2d Am. Compl. ¶ 347.)

32. Listed in the order they appear in the second amended complaint, the claims are as follows: (1) a direct claim for inspection of books and records (against CapitalNexus); (2) direct and derivative claims for declaratory judgment (against CapitalNexus, Avivar, Lotus, Iris, and Athena); (3) direct and derivative claims for civil conspiracy and facilitation of fraud (against the Conspiracy Defendants); (4) a direct claim for fraud in the inducement (against the Conspiracy Defendants); (5) a direct claim for negligent misrepresentation (against the Conspiracy Defendants); (6) a direct claim for violations of the North Carolina Securities Act (against the Conspiracy Defendants); (7) a direct claim for breach of the Investment Memo and Investment Summary (against the Conspiracy Defendants); (8) direct and derivative claims for breach of Charlotte Harris's partnership agreement (against the Conspiracy Defendants); (9) direct and derivative claims for breach of fiduciary duty (against the Conspiracy Defendants); (10) direct and derivative claims for constructive fraud (against the Conspiracy Defendants); (11) direct and derivative claims for wrongful interference with contract (against Sterling and the Mittals); (12) direct and derivative claims for breach of the operating agreements of Avivar, Iris, and Lotus (against the Conspiracy Defendants); (13) direct and derivative claims for fraud (against the Conspiracy Defendants); and (14) direct and derivative claims

for unfair or deceptive trade practices under N.C.G.S. § 75-1.1 (against the Conspiracy Defendants).

33. The CapitalNexus Defendants, the Mittal Defendants, and Sterling have filed separate motions to dismiss. Taken together, these motions aim to dismiss the second amended complaint in its entirety. (*See* ECF Nos. 85, 87, 104.)

34. All three motions are ripe for decision.

## II.
## LEGAL STANDARD

35. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (citation and quotation marks omitted). Dismissal is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted).

36. In deciding the motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inference "in the light most favorable to the non-moving party." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation and quotation marks omitted). But the Court need not accept as true any "conclusions of law or unwarranted deductions of fact." *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (citation and quotation marks omitted). It is appropriate to consider documents "attached to and incorporated within" the

pleading without converting the motion into a motion for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204 (2007).

III.
ANALYSIS

37. A few initial observations will help frame the discussion below. First, the second amended complaint is full of group pleading, referring again and again to "Conspiracy Defendants" without attributing alleged acts to a specific person or entity. In a similar vein, the second amended complaint uses "Tony" to mean both Tony Zhang and CapitalNexus, and it uses "the Mittals" to mean not only Anuj and Vinita Mittal but also Zion (a nonparty) and four entities with MJM in their names (two parties, two nonparties). Jumbling parties together in this way frustrates the basic purpose of pleading, which is to give defendants in litigation notice of what they are supposed to have done wrong. For that reason, this Court has "express[ed] its strong disapproval of this practice." *DT Lulana Gardens LLC v. SDCK I LLC*, 2026 NCBC LEXIS 99, at *2 n.1 (N.C. Super. Ct. Apr. 28, 2026); *see also Spring v. Lawson*, 2026 NCBC LEXIS 97, at *8 (N.C. Super. Ct. Apr. 27, 2026) (disapproving "improper group pleading").

38. Second, Hui and Jing have muddled their theories of liability. On its face, the second amended complaint claims that all the so-called Conspiracy Defendants are liable not only as conspirators (meaning that each is liable for the acts of others done in furtherance of the conspiracy) but also as individuals (meaning that each is independently liable for his own acts) for nearly a dozen causes of action. It is clear, though, that Hui and Jing do not believe that all these defendants are individually

liable for all these claims. The failure to delineate one theory of liability from another, combined with pervasive group pleading, has made it unusually difficult for the defendants and the Court to comprehend the allegations.

39. Third, despite collectively using tens of thousands of words, the parties occasionally look past or otherwise fail to engage with their opponents' arguments. By doing so, they have tacitly conceded certain points or, at the very least, left those points uncontested. *See Elhulu v. Alshalabi*, 2021 NCBC LEXIS 44, at *21 (N.C. Super. Ct. Apr. 29, 2021); *see also Glover Constr. Co. v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 76, at *23 (N.C. Super. Ct. June 18, 2020).

40. With these observations in mind, the Court has endeavored to give a fair reading to the allegations and arguments in the discussion below.

## A. Derivative Claims

41. The Court begins with the derivative claims that Hui and Jing assert on behalf of Charlotte Harris. There are nine such claims. Defendants challenge all nine on procedural grounds, arguing that dismissal is appropriate because Hui and Jing did not verify their complaint and made no prelitigation effort to convince Charlotte Harris's general partner to bring the claims directly.

42. By rule, "the complaint shall be verified by oath" in any derivative action brought by "one or more shareholders or members of a corporation or an unincorporated association." N.C. R. Civ. P. 23(b). This "is not simply a technicality." *Marcoux v. Prim*, 2004 NCBC LEXIS 4, at *23 (N.C. Super. Ct. Apr. 16, 2004). It is "a means to discourage strike suits by people who might be interested in getting quick

dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to get rid of them." *Alford v. Shaw*, 327 N.C. 526, 532 (1990) (cleaned up). Verification ensures "that the plaintiff has investigated the charges and found them to be of substance." *Id.* (citing *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177 (N.D. Ill. 1987)).

43. Hui and Jing argue that derivative actions on behalf of limited partnerships, such as Charlotte Harris, are exempt from this requirement because limited partnerships are neither corporations nor unincorporated associations. They are wrong.

44. Rule 23(b) uses the term "corporation" in its broad, ordinary sense to mean an entity "that has a legal personality distinct from the natural persons who make it up, exists indefinitely apart from them, and has the legal powers that its constitution gives it." *Corporation*, Black's Law Dictionary (10th ed. 2014); *see also Potts v. KEL, LLC*, 2021 NCBC LEXIS 100, at *29 n.6 (N.C. Super. Ct. Nov. 5, 2021) (comparing similar definitions, both past and present). This definition covers not only entities organized under the North Carolina Business Corporation Act but also professional corporations, limited liability companies, and limited partnerships. *See Trujillo v. N.C. Grange Mut. Ins. Co.,* 149 N.C. App. 811, 815 (2002) ("A partnership is a distinct entity from the individual members constituting it." (citation and quotation marks omitted)). For that reason, courts have routinely—and without controversy—applied Rule 23(b) to derivative actions brought on behalf of all sorts of corporate entities, including partnerships. *See, e.g.*, *Peak Coastal Ventures, L.L.P. v. SunTrust Bank,*

2011 NCBC LEXIS 13, at *23–24 (N.C. Super. Ct. May 5, 2011) (dismissing derivative action on behalf of LLC partly due to plaintiff's failure to verify complaint); *see also, e.g.*, *Cohen v. Flat Stone Dev. Co.*, 2018 U.S. Dist. LEXIS 243688, at *8 (S.D. Tex. Oct. 5, 2018) (applying analogous federal rule to partnership); *Abeloff v. Barth*, 119 F.R.D. 332, 334 (D. Mass. 1988) (observing that the analogous federal rule "is equally applicable to partnerships").

45. Because Hui and Jing did not verify the second amended complaint, the Court dismisses their derivative claims without prejudice. Having done so, the Court need not decide whether Hui and Jing complied with other procedural requirements for derivative claims.

## B. Contract Claims

46. Turning to the direct claims, the Court next considers three claims for breach of contract. Hui and Jing assert claims for breach of the Investment Memo and Summary, the partnership agreement for Charlotte Harris, and the operating agreements for Avivar, Iris, and Lotus. These claims—all of which are asserted against the Conspiracy Defendants—appear as the seventh, eighth, and twelfth claims for relief.

47. To state a claim for breach of contract, a plaintiff must allege the "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). For purposes of a motion to dismiss, the contract itself is controlling and takes precedence over conflicting allegations in the pleading. *See, e.g.*, *Reese v. Mecklenburg Cnty.*, 204 N.C. App. 410, 421 (2010).

48. **Investment Memo & Summary.** According to Hui and Jing, the Investment Memo guarantees a return of their investments plus dividends upon demand for any reason. In addition, they say, the Investment Summary bolsters that guarantee with promises not to liquidate Northlake Hotel or dispose of their equity interests in Charlotte Harris. Although Hui and Jing assert this claim against all Conspiracy Defendants, the second amended complaint states only that "Tony and the Mittals breached" the alleged promises. (*See* 2d Am. Compl. ¶¶ 400, 401, 405.)

49. Defendants move to dismiss this claim on a host of grounds. The CapitalNexus Defendants contend, among other things, that they did not personally guarantee a return of principal; rather, it was Charlotte Harris that promised a refund upon certain conditions. The Mittal Defendants dispute whether the Investment Summary is a contract at all and contend that they are not parties to the Investment Memo or Summary, assuming either is a contract. Sterling's arguments echo those of the Mittal Defendants.

50. These arguments are persuasive. On its face, the Investment Summary contains nothing more than a brief description of the hotel project and the steps involved in applying for a green card through the EB-5 program. The document does not purport to be a contract and therefore cannot serve as the basis for a claim for breach of contract. *See, e.g., Woods v. Sentry Ins. a Mut. Co.*, 2008 N.C. App. LEXIS 1773, at *17 (N.C. Ct. App. Oct. 7, 2008) (unpublished) ("Because there was no settlement agreement between Plaintiffs and Defendants, Defendants could not have breached the alleged agreement.").

51. As for the Investment Memo, its text contradicts what is alleged. The document does not use the word "guarantee." Nor does it state that Tony, the Mittals, or any related party would act as a guarantor. All that is stated is that "the $500,000 investment capital and dividends . . . will be *refunded* to the investor's account" if Hui or Jing demand a refund before obtaining permanent residency. (Investment Memo (emphasis added).) Assuming that the Investment Memo is an enforceable agreement, this is at most a promise by Charlotte Harris to refund the capital that it received from Hui and Jing. Had Hui and Jing wanted Tony or anyone else to guarantee Charlotte Harris's obligation, they could have included appropriate language. Because they did not, they may not assert a claim for breach of a nonexistent guarantee. *See, e.g.*, *Wrightsville Health Holdings, LLC v. Buckner*, 2017 N.C. App. LEXIS 124, at *8–9 (N.C. Ct. App. Feb. 21, 2017) (unpublished) (affirming dismissal of claim for breach of contract when defendant had no contractual obligation).

52. Accordingly, the Court grants the motions to dismiss the claim for breach of the Investment Memo and Summary. In its discretion, and considering that Hui and Jing have already amended their complaint twice, the Court dismisses this claim with prejudice. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) ("The decision to dismiss an action with or without prejudice is in the discretion of the trial court . . . .").

53. **Partnership Agreement.** Hui and Jing assert a claim for breach of more than a dozen provisions of Charlotte Harris's partnership agreement. Although they

assert this claim against all Conspiracy Defendants, they specify that "Tony materially breached the Partnership Agreement." As examples, Hui and Jing challenge the compensation that Tony received, the preferred treatment allegedly given to a few other EB-5 investors, the liquidation of Northlake Hotel, the transfer of Charlotte Harris's equity in Avivar to other entities, and the redirection of capital from hotel operations to a coffee shop. (*See, e.g.*, 2d Am. Compl. ¶¶ 407–10, 414, 415, 426.)

54. The Mittal Defendants correctly observe that they are not parties to the partnership agreement. So too for Sterling, QC Vantage, Novus, and Athena. In their response briefs, Hui and Jing do not address this point or provide any basis to maintain a claim for breach of contract against these individuals and entities. Indeed, the second amended complaint does not name them as contracting parties or allege that any of them performed any act constituting a breach of the agreement's terms. The Court therefore dismisses with prejudice the claim as asserted against the Mittal Defendants, Sterling, QC Vantage, Novus, and Athena. *See, e.g.*, *Canady v. Mann*, 107 N.C. App. 252, 259 (1992) ("Since defendant Johnson was not a party to the contract, as a matter of law he cannot be held liable for any breach that may have occurred.").

55. That leaves Tony and CapitalNexus, whose opening brief does not clearly state their grounds for moving to dismiss this claim. As best the Court can tell, they contend that Hui and Jing lack standing to pursue individual claims for breach. It is clear, though, that Hui and Jing are parties to the partnership agreement, and a

contracting party will generally have standing to sue for breach. *See King Fa, LLC v. Chen*, 248 N.C. App. 221, 224–25 (2016) ("In the context of a breach of contract claim, the parties who execute an agreement are real parties in interest and have standing to sue." (emphasis omitted)). Arguably, a limited partner may lack standing to sue for breach of a contractual provision that creates a duty owed only to the partnership. *See 759 Ventures, LLC v. GCP Apt. Invs., LLC*, 2018 NCBC LEXIS 82, at \*10–11 (N.C. Super. Ct. Aug. 13, 2018) ("To the extent the relevant term in an operating agreement gives rise to a duty owed to the company, a claim for breach of that duty is one belonging to the company, and not generally to its members or managers."). But Tony and CapitalNexus do not distinguish between those provisions that Hui and Jing may and may not enforce directly. The Court will not make that argument for them and therefore denies the motion to dismiss the claim for breach of the partnership agreement against Tony and CapitalNexus.

56. **<u>Operating Agreements.</u>** Avivar's operating agreement obligates its members and managers to "make reasonable efforts to conduct the affairs of the Company in a manner that complies with all rules and regulations associated with the EB-5 Program." Similar provisions appear in the operating agreements for Iris and Lotus. As alleged, "the Conspiracy Defendants breached each of the operating agreements" by failing to keep the capital of Charlotte Harris deployed, disregarding Charlotte Harris's business plan, and failing to consult immigration counsel concerning these decisions. Although Hui and Jing are not contracting parties, they allege that they are third-party beneficiaries of each operating agreement and

therefore may sue for breach. (*See* 2d Am. Compl. ¶¶ 458, 459; Avivar Op. Agrmt. ¶ 4.7, ECF No. 4.12; Lotus Op. Agrmt. 1 ¶ 4.7, ECF No. 55.1; Iris Op. Agrmt. ¶ 4.7, ECF No. 4.18.)

57. "North Carolina recognizes the right of a third-party beneficiary to sue for breach of a contract executed for his benefit." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651 (1991) (cleaned up). "When a third person seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement." *Babb v. Bynum & Murphrey, PLLC*, 182 N.C. App. 750, 754 (2007) (citation and quotation marks omitted).

58. No defendant contends, at least for purposes of these motions, that Hui and Jing are not third-party beneficiaries. Instead, the Conspiracy Defendants raise a smattering of other arguments.

59. The Mittal Defendants contend that Hui and Jing cannot enforce rights unrelated to their immigration status and that the allegations show that no alleged breach has imperiled their applications for permanent residency. That is not readily apparent, however. The second amended complaint alleges repeatedly that the actions allegedly constituting the breaches of contract are also violations of EB-5 regulations. (*See* 2d Am. Compl. ¶¶ 103(g)(ii), 152, 155, 248, 267, 456, 457.) Taking the allegations as true, these actions have jeopardized Hui's and Jing's immigration applications, which remain pending. (*See* 2d Am. Compl. ¶¶ 101, 459.)

60.     The Mittal Defendants also argue that the statute of limitations bars this claim because Hui and Jing should have known of the facts giving rise to their claim sometime in 2020.[2]  Rarely do courts dismiss claims at the Rule 12(b)(6) stage as untimely.  A statute of limitations "may be the basis" for dismissal only "if on its face the complaint reveals the claim is barred." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (citations omitted).  But what Hui and Jing should have known is a fact-intensive question not suited to a Rule 12(b)(6) motion.  It is far from clear on the face of the second amended complaint that Hui and Jing could have or should have discovered the alleged misconduct any earlier than they did.  *See Jordan v. Bradsher*, 2016 N.C. App. LEXIS 720, at *6–8 (N.C. Ct. App. July 5, 2016); *see also Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 486 (2004) (noting that when a plaintiff should have discovered alleged wrongdoing is usually a question of fact (citing *Feibus & Co., Inc. v. Godley Constr. Co.*, 301 N.C. 294, 304–05 (1980))).

61.     As best the Court can tell, Tony and CapitalNexus dispute whether Hui and Jing have individual standing.  Again, though, if Hui and Jing are third-party beneficiaries of the operating agreements, they have standing to sue for breach.  *See Raritan River Steel*, 329 N.C. at 651 (recognizing "the *right* of a third-party beneficiary to sue for breach" (emphasis added)).

---

[2] Notably, Sterling offers no argument specifically directed to this claim.  Sterling does appear to rely generally on the statute of limitations for reasons similar to those given by the Mittal Defendants.

62. In addition, QC Vantage, Novus, and Athena appear to contend in passing that they are not contracting parties and could not have breached the operating agreements. Some factual development is needed on this point, however, given that at least QC Vantage and Novus are alleged to have been members of one or more of the subject LLCs. Sorting out each LLC's membership is a task better left for summary judgment.

63. Accordingly, the Court denies the motion to dismiss this claim.

C. <u>Fraud & Related Claims</u>

64. Next, the Court turns to a series of claims that sound in fraud. One group of claims is based on allegations that Hui and Jing were fraudulently or negligently induced to invest in Charlotte Harris. An additional, separate claim concerns allegations of fraud in connection with Avivar's bankruptcy proceeding.

65. **Wrongful Inducement.** Hui and Jing allege that Tony made a series of misrepresentations designed to induce them to invest in Charlotte Harris: first, that Tony's Chinese translations of legal documents "were accurate, reliable, and binding"; second, that "Charlotte Harris had the intent and ability to return" Hui's and Jing's principal investments upon demand; third, that the Conspiracy Defendants "had an unblemished record of successfully developing hotel properties"; fourth, that "the only other member of Avivar was MJM Group Managers and that MJM Group Managers had contributed $8 million (or its cash equivalent) to Avivar"; and fifth, that Northlake Hotel would not be liquidated "prior to final I-829 adjudication of all the EB-5 Investors." (2d Am. Compl. ¶¶ 364–68.) According to Hui and Jing, these

allegations support claims against all Conspiracy Defendants for fraudulent misrepresentation, negligent misrepresentation, and securities violations under N.C.G.S. § 78A-56. These claims appear as the fourth, fifth, and sixth claims for relief.

66. Fraud has five "essential elements": (a) a false representation or concealment of a material fact, (b) calculated to deceive, (c) made with intent to deceive, (d) that did in fact deceive, and (e) that resulted in damage to the injured party. *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992). The plaintiff must show not only that she actually relied on the misrepresentation but also that her reliance was reasonable. *See Forbis v. Neal*, 361 N.C. 519, 527 (2007). Ordinarily, "[r]eliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277 (2011).

67. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 484 (2004) (citation and quotation marks omitted). Justifiable reliance is analogous to the element of reasonable reliance in fraud cases. *See Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 350 N.C. 214, 224 (1999).

68. The North Carolina Securities Act "creates private rights of action that are complementary to federal securities schemes." *Piazza v. Kirkbride*, 246 N.C. App. 576, 595 (2016), *aff'd in part and modified in part on other grounds*, 372 N.C. 137

(2019). Hui and Jing rely on section 78A-56(a)(1), which addresses conduct akin to common-law fraud. *See Brown v. Secor*, 2020 NCBC LEXIS 134, at *29 (N.C. Super. Ct. Nov. 13, 2020). A person who materially aids another in committing securities fraud may be secondarily liable under section 78A-56(c). *See id.* at *28–29.

69. Allegations of fraudulent and negligent misrepresentation must "be stated with particularity." N.C. R. Civ. P. 9(b); *see also Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 265 (2023) (applying Rule 9(b) to claims for negligent misrepresentation); *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at *35–36 (N.C. Super. Ct. Feb. 19, 2013) (applying Rule 9(b) to claims under N.C.G.S. § 78A-56(a)(1)). This "requirement is met by alleging the time, place, and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent act or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981).

70. Defendants seek to dismiss these claims on a host of grounds. They argue, among other things, that the allegations are not stated with particularity, that the various contracts contradict certain allegations, that Hui and Jing did not reasonably rely on any representations, and that the claims are time-barred.

71. Let's take the alleged misrepresentations one at a time, beginning with the allegation that the project brochure given to Hui and Jing represented that the developers had an unblemished record of success. As the Mittal Defendants correctly point out, the project brochure highlights examples of successful past projects but does not say that the developers had an unblemished record. Hui and Jing contend

that it was fraudulent to identify successes without also identifying failed projects, including a failed hotel development on the site chosen for the Northlake Hotel. Nowhere, though, does the second amended complaint plead with particularity that Tony—much less the other Conspiracy Defendants—had a duty to disclose failed projects. *See, e.g.*, *Comput. Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc.*, 124 N.C. App. 383, 389 (1996) (observing that parties had "no duty of disclosure" when negotiating a commercial transaction). Absent a false representation or concealment of fact, this allegation cannot support the asserted claims.

72. Next, consider the alleged representation that Tony's translations of legal documents were accurate and binding. The subscription agreement expressly contradicts this allegation. In that document, Hui and Jing affirm that each of them "either reads and understands English, or has had" all contracts and related legal documents "translated by a trusted advisor into a language that the investor does understand." (Compl. Ex. 3 at 87 (all caps omitted).) The subscription agreement goes on to state that any translation provided by Charlotte Harris "has been provided only for the convenience of the reader and shall not be enforceable by or against any party for any purpose." (Compl. Ex. 3 at 87.)

73. Hui and Jing are bound by these contractual acknowledgments. Although they now contend that they do not understand English and therefore could not read the legal documents given to them, "parties to a contract have an affirmative duty to read and understand a written contract before they sign it." *Westmoreland v. High Point Healthcare Inc.*, 218 N.C. App. 76, 83 (2012). Hui and Jing had the documents

in hand; they could have obtained an independent translation. Indeed, the offering memo urges each investor "to consult with his own counsel," (Compl. Ex. 3 at 40), and the contracts include an acknowledgment that each investor "has consulted with his or her own legal, accounting, tax, investment and other advisers to the extent the Investor has deemed necessary," (Compl. Ex. 3 at 86). Their failure to investigate— and instead to rely on Tony's one-page Chinese summary of ninety-nine pages of English legal documents—was not reasonable. *See, e.g.*, *Calloway v. Wyatt*, 246 N.C. 129, 135 (1957) ("The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest."); *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 213 (2007) ("The law will not relieve one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing . . . when he could inform himself and has not done so." (cleaned up)).

74. A third alleged representation is that Charlotte Harris had the intent and ability to return Hui's and Jing's principal investments upon demand. The documents contradict this allegation as well. The offering memorandum expressly warns that "[t]here is no guarantee that an Investor will receive either a return *of* his or her investment, or a return *on* his or her investment." (Compl. Ex. 3 at 11 (emphasis in original).) In addition, the partnership agreement restricts each limited partner's ability to withdraw and retrieve capital. (*See* Compl. Ex. 3 at 67.)

75. The remaining allegations fare better, however. As alleged, Hui and Jing were told that Avivar would not liquidate Northlake Hotel before the EB-5 investors

completed the regulatory process for permanent residency (that is, final adjudication of what is known as an I-829 petition). (2d Am. Compl. ¶ 368.) Indeed, the offering memo states that Charlotte Harris would "endeavor to ensure" that liquidation would "not occur until after the adjudication of all Limited Partners' I-829 petitions." (Compl. Ex. 3 at 11.) But Tony and the Mittals allegedly had plans to liquidate the hotel as soon as construction ended and had promised as much to Sterling. (2d Am. Compl. ¶¶ 153, 368.) It is well settled that "a promissory misrepresentation may constitute actual fraud if the misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Braun v. Glade Valley School, Inc.*, 77 N.C. App. 83, 87 (1985).

76. Similarly, Tony allegedly represented that "the only other member of Avivar was MJM Group Managers and that MJM Group Managers had contributed $8 million (or its cash equivalent) to Avivar." (2d Am. Compl. ¶ 367.) Hui and Jing allege that both statements were false: MJM Group Managers did not become a member of Avivar, and the Mittals did not contribute $8 million. (*See, e.g.*, 2d Am. Compl. ¶¶ 131, 132.) The capital shortfall, according to Hui and Jing, was material and led to Avivar's eventual insolvency.

77. Taken as true, the allegations concerning these latter two misrepresentations are sufficiently particular to support a claim for fraud against Tony and CapitalNexus.[3] But Hui and Jing cannot stretch the claim through group

---

[3] Although Tony and CapitalNexus (and the other Defendants) again contend that the claim is barred by the statute of limitations, the Court disagrees. When Hui and Jing should have become aware of the facts supporting their claim is a fact-intensive question. The claim is not untimely on the face of the complaint.

pleading to include each and every one of the so-called Conspiracy Defendants. There are no particularized allegations tending to show that anyone other than Tony and CapitalNexus made misrepresentations to Hui and Jing. Whether the rest of the Conspiracy Defendants may be held liable as conspirators is a different question, addressed below.

78. Accordingly, the Court denies the motions to dismiss the fourth, fifth, and sixth claims for relief, albeit limited to Tony and CapitalNexus and to the alleged misrepresentations concerning the liquidation of Northlake Hotel and the membership and capital contribution of MJM Group Managers.

79. **Post-investment Fraud.** An additional fraud claim—separate and distinct from the claim for fraudulent inducement—appears as the thirteenth claim for relief. In this claim, Hui and Jing allege that Tony told Charlotte Harris's limited partners that Northlake Hotel was operating normally when, in fact, it had defaulted on its secured debt and entered Chapter 11 bankruptcy. At the same time, Tony allegedly concealed Charlotte Harris's status as an interested party from the bankruptcy court. Unaware of the bankruptcy proceeding, Hui and Jing say, the EB-5 investors were unable to intervene and prevent Northlake Hotel's liquidation. (*See* 2d Am. Compl. ¶¶ 85, 88, 214–17.)

80. Our Supreme Court has "equated the status of limited partners in a partnership to the relationship that exists between corporate shareholders and the corporation." *Energy Invs. Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 335 (2000). Just as a shareholder may not sue individually for a cause of action belonging

to the corporation, "one partner may not sue in his own name, and for his benefit, upon a cause of action in favor of a partnership." *Id.* (citation and quotation marks omitted). An exception exists when a limited plaintiff alleges either that she has suffered a separate and distinct injury or that the alleged wrongdoer owes her a special duty. *See id.*; *see also Jackson v. Marshall*, 140 N.C. App. 504, 508 (2000).

81. Here, Hui and Jing allege that Charlotte Harris was kept on the sidelines during Avivar's bankruptcy, unable to protect its interests. Any injury that Hui and Jing suffered is derivative of the injury to the partnership as a whole. They have not alleged a separate, distinct injury that might support an individual claim. *See Jackson*, 140 N.C. App. at 509 ("The question is not whether the plaintiff is in a less favorable position than the general partner, but whether the plaintiff is in a less favorable position when compared to all other limited partners."). Nor have they alleged that any defendant owed them a special duty. *See Gaskin v. J.S. Procter Co., LLC,* 196 N.C. App. 447, 456 (2009) (concluding that partnership agreement did not create a special duty). Accordingly, Hui and Jing do not have standing to pursue an individual claim for harm stemming from Charlotte Harris's exclusion from the bankruptcy proceeding.

82. More fundamentally, the claim bears all the hallmarks of an impermissible collateral attack on the bankruptcy proceeding. Hui and Jing go so far as to allege that the bankruptcy court was "defrauded"—effectively, asking this Court to conclude that the bankruptcy court erred or at least that it would have decided not to liquidate Northlake Hotel had it known all the facts. (*See* 2d Am. Compl. ¶ 466.) But this is

the wrong forum for such a challenge. *See, e.g.*, *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 861 (9th Cir. 2008) ("Thus, a final order lifting an automatic stay is binding as to the property or interest in question—the *res*—and its scope is not limited to the particular parties before the court."); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 732 (8th Cir. 2004) ("A bankruptcy sale under 11 U.S.C. § 363, free and clear of all liens, is a judgment that is good as against the world, not merely as against parties to the proceedings.").

83. Having concluded that Hui and Jing lack standing to pursue this claim, the Court dismisses it without prejudice. *See, e.g.*, *Button v. Level Four Orthotics & Prosthetics, Inc.*, 2020 NCBC LEXIS 30, at *21 n.6 (N.C. Super. Ct. Mar. 13, 2020) ("A dismissal for lack of subject matter jurisdiction is generally a dismissal without prejudice." (cleaned up)).

D. Fiduciary Claims

84. Hui and Jing assert related claims for breach of fiduciary duty and constructive fraud against all Conspiracy Defendants. These claims, enumerated as the ninth and tenth claims for relief, rest on two separate sets of allegations.

85. First, Hui and Jing allege that Tony, as general partner, had a fiduciary responsibility to Charlotte Harris. Tony allegedly breached his fiduciary duties by, among other things, engaging in self-dealing, giving preferential treatment to the Mittals and others at the expense of Charlotte Harris, and forfeiting control over Avivar and Iris. (*See, e.g.*, 2d Am. Compl. ¶¶ 432–34, 438, 439, 441–43, 447.)

86. Second, Hui and Jing allege that the Mittals, as managers of Avivar and Iris, owed fiduciary duties to Charlotte Harris. The Mittals allegedly breached their fiduciary duties by engaging in self-dealing, removing Charlotte Harris as a member of Avivar, and more. (*See, e.g.*, 2d Am. Compl. ¶¶ 432–34, 438, 439, 441–43, 447.)

87. Constructive fraud and breach of fiduciary duty are distinct claims with overlapping elements. To state a claim for breach of fiduciary duty, the plaintiff must plead the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by the breach. *See Green v. Freeman*, 367 N.C. 136, 141 (2013). Constructive fraud requires, as an additional element, that the defendant sought to benefit himself through the breach. *See White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294 (2004).

88. For reasons similar to those discussed above, the Court concludes that Hui and Jing lack standing. The thrust of the allegations is that Tony and the Mittals breached duties owed to Charlotte Harris, not to Hui and Jing personally. Any injury that Hui and Jing suffered is derivative of the injury to the partnership. *See, e.g.*, *Chi v. N. Riverfront Marina & Hotel LLLP*, 2023 NCBC LEXIS 89, at *45 (N.C. Super. Ct. July 27, 2023) (dismissing individual claim for breach of fiduciary duty when based on an allegation that defendant "breached its fiduciary duties to the partnership as a whole"). Absent allegations sufficient to establish a separate, distinct injury or a special duty, they lack standing to pursue an individual claim. *See Jackson*, 140 N.C. App. at 509; *Gaskin,* 196 N.C. App. at 456.

89. The Court therefore dismisses these claims without prejudice for lack of standing.

E. Tortious Interference with Contract

90. Hui and Jing assert their eleventh claim—for tortious interference with contract—against Sterling and the Mittal Defendants. As alleged, Sterling and the Mittal Defendants improperly interfered with the Investment Memo, Investment Summary, and Partnership Agreement. (*See* 2d Am. Compl. ¶¶ 450, 451.)

91. To state a claim for tortious interference with contract, the plaintiff must allege that a valid contract exists between it and a third person and that the defendant knew of the contract, intentionally induced the third person not to perform the contract, did so without justification, and caused actual damage. *See Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992). Inducement requires purposeful conduct by the defendant. *See, e.g.*, *Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at *38 (N.C. Super. Ct. Apr. 25, 2024); *Gallaher v. Ciszek*, 2020 NCBC LEXIS 124, at *16 (N.C. Super. Ct. Oct. 16, 2020).

92. Sterling and the Mittal Defendants argue that the allegations of inducement are conclusory and therefore insufficient to state a claim. The Court agrees. The only paragraph in the second amended complaint on this point alleges in conclusory fashion that "[t]he Mittals and, upon information and belief, Sterling . . . intentionally induced Tony not to perform under the contracts." (2d Am. Compl. ¶ 451.) As numerous decisions have held, however, "[c]onclusory allegations that merely state that a defendant has 'induced' or 'caused' a third party to breach a contract with a

plaintiff . . . are insufficient to satisfy the inducement element." *Truist*, 2024 NCBC LEXIS 62, at *38–39; *see also, e.g.*, *Barings LLC v. Fowler*, 2025 NCBC LEXIS 18, at *16–17 (N.C. Super. Ct. Feb. 13, 2025) (dismissing claim because allegations of inducement were conclusory); *Prometheus Grp. Enters., LLC v. Gibson*, 2023 NCBC LEXIS 42, at *28 (N.C. Super. Ct. Mar. 21, 2023) (same); *Morris Int'l, Inc. v. Packer*, 2020 NCBC LEXIS 122, at *18 (N.C. Super. Ct. Oct. 15, 2020) (same); *Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *29 (N.C. Super. Ct. Aug. 20, 2019) (same).

93.     The Court therefore grants the motion to dismiss this claim.  Because Hui and Jing have already amended their complaint twice, the Court dismisses this claim with prejudice.

### F.  Section 75-1.1

94.     The fourteenth claim for relief is a catchall claim, again asserted against all Conspiracy Defendants.  In short, Hui and Jing claim that the alleged fraudulent acts, breaches of fiduciary duty, and other misconduct are also unfair or deceptive trade practices under section 75-1.1.  But all the alleged misconduct involves investment solicitations, acquisition of capital, and mismanagement and self-dealing internal to the partnership and related businesses.  Our appellate courts have repeatedly held that this sort of conduct is not "in or affecting commerce" within the meaning of section 75-1.1.  *See Nobel v. Foxmoor Group, LLC*, 380 N.C. 116, 121–22 (2022) (affirming dismissal of claim based on misuse of capital contribution); *White v.*

*Thompson*, 364 N.C. 47, 51–52 (2010) (affirming dismissal of claim based on conduct "solely related to the internal operations" of business).

95. Accordingly, the Court dismisses the section 75-1.1 claim with prejudice.

## G. Conspiracy

96. The third claim for relief is for civil conspiracy and facilitation of fraud. It is—no surprise—asserted against the Conspiracy Defendants.

97. Civil conspiracy comprises three elements: (1) a conspiracy; (2) wrongful actions taken by at least one of the conspirators in furtherance of that conspiracy; and (3) injury to the plaintiff as a result. *See Krawiec v. Manly*, 370 N.C. 602, 614 (2018). A conspiracy requires an agreement between at least two persons to take an unlawful action or to take a lawful action in an unlawful manner. *See id.* at 613; *Evans v. Star GMC Sales & Serv., Inc.*, 268 N.C. 544, 546 (1966). Because these elements "are broadly stated," the burden in seeking to dismiss a conspiracy claim "is difficult" to meet. *Safety Test & Equip Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *48 (N.C. Super. Ct. Apr. 23, 2015).

98. Facilitation of fraud requires: "(1) that the defendants agreed to defraud the plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act." *Weaver v. Villmer*, 2023 NCBC LEXIS 92, at *24 (N.C. Super. Ct. July 31, 2023) (citation and quotation marks omitted). "Thus, where, as here, the object of the parties' alleged agreement is to defraud another, a claim for civil conspiracy to commit fraud and a claim for

facilitating fraud are essentially the same claim." *TaiDoc Tech. Corp v. OK Biotech Co.,* 2016 NCBC LEXIS 26, at \*30 (N.C. Super. Ct. Mar. 28, 2016).

99. There is no standalone claim for civil conspiracy or facilitation of fraud. "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002). "The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." *Dove v. Harvey*, 168 N.C. App. 687, 690 (2005) (citation and quotation marks omitted).

100. The Mittal Defendants argue only that this claim cannot survive because there are no valid underlying claims. But the Court has not dismissed the claims based on allegations of breach of the partnership agreement, breach of the operating agreements, and fraudulent inducement.

101. The CapitalNexus Defendants argue that the allegations of the second amended complaint are not believable. This is so, they say, because the alleged conspirators eventually turned on one another and fought a protracted legal battle, including multiple lawsuits and arbitrations. At this stage, however, the Court must take the allegations as true. And the fact that the alleged conspirators had a falling out does not negate the possibility that they conspired in the first place to the detriment of Hui and Jing. *Cf. United States v. Khan*, 2008 U.S. Dist. LEXIS 43329,

at *8–9 (E.D.N.Y. June 2, 2008) ("[T]he existence of hostility between allege co-conspirators does not necessarily vitiate the possibility of a conspiracy between them.").

102. The CapitalNexus Defendants also rely on intracorporate immunity. This doctrine holds that "there can be no conspiracy" between a corporation and its agents. *Chrysler Credit Corp. v. Rebhan*, 66 N.C. App. 255, 259 (1984); *Estate of Tipton v. High Point Univ.*, 2015 N.C. App. LEXIS 479, at *7 (N.C. Ct. App. June 16, 2015) (unpublished) (stating that "a corporation cannot conspire with itself"). According to the CapitalNexus Defendants, the allegation that Tony acted as the Mittals' agent destroys any claim for conspiracy. Not so. A conspiracy may exist "if independent third parties are alleged to have joined the conspiracy." *Potts v. KEL, LLC*, 2019 NCBC LEXIS 30, at *23 (May 9, 2019) (citation and quotation marks omitted). The alleged conspiracy includes Sterling, an independent party, even if Tony and the Mittals are assumed not to be independent of one another. The Court therefore cannot conclude that Hui and Jing have pleaded their claim in such a way as to be self-defeating.

103. It appears that Defendants also rely on arguments made in connection with other claims, such as a lack of individual standing and untimeliness under the statute of limitations. Because the Court has addressed these arguments, there is no need to repeat that discussion.

104. Accordingly, the Court denies the motion to dismiss the claim for conspiracy and facilitation of fraud.

## H. Inspection Rights

105. Hui and Jing seek to enforce their statutory and contractual inspection rights—specifically, the rights to inspect partnership records granted by N.C.G.S. § 59-305 and sections 11.02 and 12.04 of Charlotte Harris's partnership agreement. This claim, enumerated as the first claim for relief, is asserted against only CapitalNexus.

106. CapitalNexus argues that it has produced thousands of pages of documents during this litigation, thereby fulfilling its obligations under section 59-305 and the partnership agreements. Even if that is true, the Court must stay within the four corners of the second amended complaint to determine whether Hui and Jing have stated a claim. Hui and Jing allege that they made an inspection demand and that their demand was refused (or, at least, met with a response so laden with unjustified conditions as to have been refused). (*See* 2d Am. Compl. ¶¶ 333, 334.) This is sufficient for pleading purposes. It may be the case that CapitalNexus's production of documents has rendered the claim moot, but that is a different question, and the limited record precludes a finding of mootness at this stage. *See, e.g.*, *Gvest Real Estate, LLC v. JS Real Estate Invs., LLC*, 2017 NCBC LEXIS 32, at *7–9 (N.C. Super. Ct. Apr. 6, 2017) (denying motion to dismiss inspection claim as moot).

107. Accordingly, the Court declines to dismiss this claim.

## I. Declaratory Judgment

108. In their direct claim for declaratory judgment, Hui and Jing allege that there are disputes about the composition of Charlotte Harris's ownership and management.

They ask the Court to declare that CapitalNexus has engaged in misconduct that disqualifies it from serving as Charlotte Harris's general partner. They also ask the Court to issue a declaration that establishes their capital accounts and confirms their ongoing right to any profits from Charlotte Harris.

109. A complaint sufficiently states a claim for declaratory judgment if it "alleges the existence of a real controversy arising out of the parties' opposing contentions and respective legal rights under a . . . contract." *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557 (1988). Dismissal is appropriate only "when the complaint does not allege an actual, genuine existing controversy." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974).

110. Whether CapitalNexus engaged in acts that permit its removal as general partner is a genuine controversy. Indeed, CapitalNexus's brief does not directly address this portion of the claim and provides no basis for dismissal.

111. There are also genuine controversies concerning the status of Hui's and Jing's capital accounts and partnership rights. Although CapitalNexus insists that Hui and Jing are wrong, the test is not whether they will "be able to prevail" on their claim. *Id.* Because the parties have a bona fide dispute on these matters, they "are entitled to a declaration of their rights and liabilities and the action should be disposed of only by a judgment declaring them." *Nationwide Mut. Ins. Co. v. Roberts*, 261 N.C. 285, 288 (1964).

112. Accordingly, the Court denies the motion to dismiss the direct claim for declaratory judgment.

## IV.
## CONCLUSION

113. For these reasons, the Court **GRANTS in part** and **DENIES in part** the motions to dismiss as stated above. For clarity, these are the direct claims that will proceed to discovery:

a.  Demand for inspection of books and records (first claim for relief), against CapitalNexus;

b.  Declaratory judgment (second claim for relief), against CapitalNexus;

c.  Civil conspiracy and facilitation of fraud (third claim for relief), against the Conspiracy Defendants;

d.  Fraud in the inducement, negligent misrepresentation, and violations of the North Carolina Securities Act (fourth, fifth, and sixth claims for relief), against Tony and CapitalNexus and limited to the alleged misrepresentations concerning the liquidation of Northlake Hotel and the membership and capital contribution of MJM Group Managers;

e.  Breach of partnership agreement (eighth claim for relief), against Tony and CapitalNexus; and

f.  Breach of the operating agreements (twelfth claim for relief), against the Conspiracy Defendants.

114. In addition, the Court **ORDERS** the parties to file a revised case management report and proposed case management order no later than 16 July 2026.

**SO ORDERED**, this the 25th day of June, 2026.

                    /s/ Adam M. Conrad
                    Adam M. Conrad
                    Special Superior Court Judge
                     for Complex Business Cases